**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **TYRONE CLAY,** | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) No. 23-CV-16799 |
| **ANTHONY F. NORADIN, SAMUEL J.** | ) |
| **CIRONE, WILLIAM BROGAN, DENIS** | ) |
| **WALSH, JOEL T. KELLER, JAMES ADAMS,** | ) |
| **NICHOLAS SPANOS, RICHARD GREEN,** | ) |
| **ROBERT BARTIK, JOHN R. GRAHAM,** | ) |
| **ALBERT PEREZ, DONALD J. FALK,** | ) The Honorable Matthew F. Kennelly |
| **JAMES G. GILGER, JOHN R. HILLMAN** | ) |
| **HILLMAN, TIMOTHY B. MCDERMOTT,** | ) |
| **MARC B. LEAVITT, HECTOR ALVAREZ,** | ) |
| **JOHN L. FOLINO, MAURIZIO INZERRA,** | ) |
| **DEMOSTHEN U. BALODIMAS,** | ) |
| **GARY H. YAMASHIROYA,** | ) |
| **GARRY MCCARTHY,** | ) |
| **JOHN DILLON, JOHN BRASSIL,** | ) |
| **ANDREW VARGA, NANCY ADDUCI,** | ) |
| **JOHN AND JANE DOE CHICAGO** | ) |
| **POLICE OFFICERS 1-10, the CITY OF** | ) |
| **CHICAGO, and COOK COUNTY, ILLINOIS** | ) |
| | ) **JURY TRIAL DEMANDED** |
| Defendants. | ) |

**FOURTH AMENDED COMPLAINT**

Plaintiff, TYRONE CLAY, by his undersigned attorney, for his complaint against

Chicago Police Officers NORADIN, CIRONE, BROGAN, WALSH, KELLER, ADAMS,

SPANOS, GREEN, BARTIK, GRAHAM, PEREZ, FALK, GILGER, HILLMAN,

MCDERMOTT, LEAVITT, FOLINO, ALVAREZ, INZERRA, BALODIMAS,

YAMASHIROYA, and MCCARTHY; Assistant Cook County State's Attorneys DILLON,

BRASSIL, VARGA, ADDUCI, and JOHN AND JANE DOE POLICE OFFICERS, the CITY OF CHICAGO and COOK COUNTY, ILLINOIS.

## INTRODUCTION

1.     Plaintiff, Tyrone Clay was detained pretrial in the Cook County Jail for nearly 12 years wrongly accused of the 2011 shooting death of off-duty Chicago Police Officer Clifton Lewis.

2.     On December 29, 2011, Lewis was shot and killed by two masked gunmen while working off-duty security at a convenience mart in the Austin neighborhood of Chicago. Unbeknownst to Plaintiff, the Chicago Police Department ("CPD") developed solid leads pointing at Four Corner Hustlers operating in the neighborhood as the perpetrators.

3.     Several sources reported that Lewis was the unintended victim and that the robbery/shooting was connected to a foiled robbery executed in the same manner in the same exact convenience store weeks earlier. During that earlier incident, a different off-duty police officer interrupted the robbery and chased after the offenders shooting at them; it was that officer who was the intended target of the December 29, 2011 robbery/homicide - not Lewis.

4.     Defendants abandoned that solid lead in favor of closing the case the Chicago way, that is, arresting people based on hunches, torturing confessions fed to them, manufacturing evidence around those false confessions all while suppressing exculpatory evidence that would expose that CPD got it wrong - yet again.

5.     The Defendant Officers contrived a crackpot theory that a high-ranking Spanish Cobra named Alexander Villa ("Villa") was responsible for the shooting based solely on a vague tip that Hispanic(s) from Humboldt Park were responsible for the shooting and that Villa drove a car that appeared to be similar in model and make as one seen in the alley behind the

convenience store near the time of shooting. Never mind that Humboldt Park had a population of over 50K people, mostly of Hispanic descent, or that thousands of people drove a car similar to the one seen in the alley. Defendants seized on this "theory" even though the evidence supporting it wouldn't justify a *Terry* stop let alone an arrest.

6.      Plaintiff was targeted because he was identified in CPD databases as an "associate" of Villa and he is Black. Video surveillance from the robbery/shooting suggested that one of the shooters was light-complected and the other was African American. Having settled on Villa as the light-complected shooter, CPD did nothing more than narrow the pool of the other shooter based on Villa's Black friends according to CPD's not-so-reliable databases.

7.      Like so many wrongful convictions carried out by CPD, this one started with the unrelated arrest of a young Hispanic man named Edgardo Colon ("Colon") who underwent four days of a brutal interrogation before implicating himself and his criminal co-defendants, including Plaintiff in the murder. Defendants were indifferent to the fact that Colon spent the first two days of his interrogation denying knowledge about the shooting and insisting that he did not even personally know Villa or Plaintiff. The Defendant Officers and Defendant Prosecutors persisted in telling Colon a story that they constructed based on little more than a vague tip, a hunch, and their own deluded belief that they could surmise guilt by looking at arrest photos.

8.      The Defendants threatened Colon in numerous ways, including by arresting and detaining his girlfriend, threatening to have his daughter taken by DCFS, and threatening his mother's Section 8 housing. When those tactics didn't work, they deprived Colon of food (for days) and vacillated between threatening him with trumped-up gun charges and promises of leniency. To earn his freedom, all he had to do was adopt the story that had been fed to him over and over and over again. A trip to the ER could not even stop the coercive interrogation.

9.      Defendants ignored every fact suggesting that their harebrained theory was pure fantasy, including for example, that Colon's cellphone did not even have contact information for any of his alleged co-conspirators.

10.     When the Defendant Officers and Defendant Prosecutors could not break Colon after two days, they conspired amongst themselves and with Judge Chiampas to illegally detain Colon for the purpose of continuing his coercive interrogation, holding him *in communicado,* and avoid bringing him before a judge who would advise him of his rights consistent with the constitutional demands of *Gerstein* and 725 ILCS 5/109-1(a). Defendants Graham, Alvarez, and Perez falsely reported in a police report and then later falsely testified that they brought Colon to the criminal court building for a *Gerstein* hearing before Judge Chiampas and that she made a finding of probable case on the UUW charge (the offense for which he was detained). The Defendant Officers' statements in their report and in their later testimony were complete fabrications. They did not bring Colon for a *Gerstein* hearing before Judge Chiampas, and Judge Chiampas made no probable cause finding at all. In fact, they never mentioned word to Judge Chiampas about Colon's arrest charge and she did not ask.

11.     Rather, on January 5, 2012, the Defendant Officers realized that they were running out of time to continue to interrogate Colon pursuant to the 48-hour rule. There were duty-judges assigned to conduct *Gerstein* hearings at 26th street during work hours and after work hours. Judge Chiampas was not the on-duty judge for conducting *Gerstein* hearings. The Defendant Officers knew that to continue their abusive interrogation Colon they had to deny Colon a *Gerstein* hearing.

12.     They informed Judge Chiampas (who was their go to judge for rubber-stamping search warrant applications) that they were going to falsely represent in their reports that she

4

made a probable cause finding after a *Gerstein* hearing. The Defendant Officers had a prior understanding with Judge Chiampas that if they needed to engage in unlawful or unconstitutional conduct, they could count on her to facilitate or cover-up that unconstitutional conduct. With no discussion about Colon's arrest charge, Judge Chiampas told the Defendant Officers in sum and substance that that they were free to falsely claim that she conducted a hearing and made a probable causing even though she never heard a word about the charge. Judge Chiampas told them she had their back, and they could say or do whatever they needed to in order to close the case, including falsely stating she made a probable cause finding so that they could continue interrogating Colon. Judge Chiampas reassured the Defendant Officers that she would corroborate their false statements if asked. She also told them she would sign any search warrant without question throughout the Lewis investigation and told them to come directly to her at any time which they did.

13. The Defendant Officers carried out the plan to fabricate a *Gerstein* hearing by creating a false paper trial. They brought Colon to 26th street, reporting falsely that he was brought there for a *Gerstein* hearing. Instead, he was brought to a holding area in the basement of 26th street. The Defendant Officers left for a short period and then returned and brought Colon back to Area Five for further interrogation. He was not brought before the duty judge for a *Gerstein* hearing nor was he brought before Judge Chiampas. No hearing of any kind was held before Judge Chiampas. Judge Chiampas did not hear a single fact about the case for which Colon was detained at any time, either on the phone or in person. Judge Chiampas made no finding of probable case and the circuit court docket does not reflect that the hearing was conducted.

5

14. After returning to Area Five, Colon's interrogation continued more intensely. Only then did he eventually succumb to the Defendants' pressure, agreeing to tell the Defendant Officers and Prosecutors what they wanted to hear. And only then was the electronic recording equipment activated. There is no recording of the first 48 hours of Colon's interrogation. Colon eventually regurgitated a rehearsed, and entirely false, story in which Plaintiff and Villa carried out the robbery and shooting of Lewis and Colon was the get-away driver.

15. Colon was not the only victim of the Defendant Officers and Defendant Prosecutors coercive tactics. Plaintiff, Villa, and another alleged associate of Villa, Melvin DeYoung, were arrested and subjected to grueling and coercive interrogations that resulted in hospital visits for both Villa and DeYoung. Even though Villa was physically abused and vomiting blood by the end of his interrogation, he did not break. The Defendant Officers and Prosecutors would have to fabricate evidence in another fashion to frame Villa almost two years later.

16. DeYoung's interrogation was so brazenly unconstitutional that the Defendants did not even bother to try to charge him. DeYoung who is a Type 1 Diabetic was interrogated for over 48 hours and denied access to his insulin. His interrogators remained in complete control of his insulin and he, too, made multiple trips to the emergency room for insulin treatments to prevent a diabetic coma. DeYoung was threatened, cajoled, repeatedly called a liar, and denied access to his lawyer who appeared at the police station to invoke his rights. The Defendant Officers and Prosecutors ignored DeYoung's assertions and were furious when they left the interview room and he looked into the camera defiantly announcing, "it's all a lie!"

17. Plaintiff was arrested on the morning of January 5, 2012 and was not charged until January 7, 2012. During that period of time, he underwent a lengthy and dehumanizing

interrogation that resulted in coerced and false inculpatory statements. Plaintiff has serious intellectual disabilities and was later tested to have an IQ of 66. He was repeatedly fed a story that he denied was the truth. Like Colon, he eventually succumbed to the prolonged pressure and repeated a false story that had been fed to him for days.

18.     A Circuit Court of Cook County judge would later suppress Plaintiff's confession, holding that "his will was overborne under the totality of the circumstances." The Illinois Appellate Court affirmed that decision. *People v. Clay*, 2020 IL App (1st) 190986-U.

19.     Even before Plaintiff and Colon were charged (and later indicted) the Defendant Officers and Defendant Prosecutors *knew* that initial cell tower evidence mapping the cellphone locations of Plaintiff, Colon, Villa, and DeYoung on the night of shooting showed they could not have committed the murder and that their statements/confessions (excepting Villa who made no inculpatory statements) had to be false.

20.     Before Defendant Brassil even approved charges against Plaintiff, he knew the cell site evidence exonerated Plaintiff, Villa, and Colon. Prior to Plaintiff's indictment, the Defendant Officers and Defendant Prosecutors also knew that Plaintiff had an airtight alibi for the time of the shooting, namely that he was literally online playing video games with other gamers. The Defendant Officers examined a gaming device that belonged to Plaintiff before he was indicted and even brought an FBI agent to Plaintiff's home to access cloud data before the device was inventoried. Defendants learned immediately that at the exact time of the shooting, Plaintiff was home playing video games on his Playstation3 ("PS3") and that his voice could be heard communicating with his fellow gamers.

21.     The Defendant Officers and Defendant Prosecutors would ultimately destroy the original cell phone data and concealed the PS3 evidence until it was no longer accessible. The

Defendant Officers and Defendant Prosecutors concealed for over a decade the exonerating FBI exigent cell tower analysis that showed: (1) none of the criminal defendants (Plaintiff, Villa, and Colon) or the unindicated co-conspirator (DeYoung) was anywhere near the scene of the crime at the time of the shooting; (2) none of them were with each other at the time of the crime or at all during the day of the incident; and (3) DeYoung and Colon had used their phones miles away from the crime scene at the precise time the shooting was occurring.

22. Simply put, the Defendant Officers and Prosecutors knew that Plaintiff and his criminal co-defendants could not have committed the crime, almost from the start. But instead of acknowledging that they had coerced confessions from Colon and Plaintiff, they doubled down and spent the next 12 years destroying and/or concealing any evidence that contradicted those confessions.

23. The misconduct carried out by law enforcement, prosecutors, and even a sitting circuit court judge is in a word - stunning. That misconduct only came to light in 2022, largely through the investigative work of Villa's post-trial counsel. Her investigation exposed brazen, indeed criminal, police and prosecutorial misconduct, including misconduct carried out by the chief of the CCSAO Conviction Integrity Unit, Defendant Adduci who, along with her partner, Defendant Varga, were caught red-handed using their private email addresses to conceal exculpatory material, directing a secret parallel investigation, and editing draft CPD reports to excise exculpatory material before they were submitted into CPD's electronic filing system.

24. The Defendants individually and collectively engaged in staggering acts of misconduct including, *inter alia,* the destruction, concealment, and alteration of exculpatory exigent cell tower analysis, the suppression and eventual destruction of exculpatory POD videos, hiding exculpatory material in the files of a secret multi-jurisdictional parallel "gang

investigation" of the Spanish Cobras that's sole purpose was to develop evidence in the Lewis homicide prosecutions, the destruction of cell phone records of alternative third party offenders, and the use of private email addresses to edit "draft" police reports to conceal or minimize exculpatory evidence.

25.     If that was not enough, as recently as last month, a previously suppressed CD in the possession of the CCSAO was uncovered with a treasure trove of additional exculpatory evidence that was never produced and which strongly suggested that Defendant Varga had altered or omitted the times on exigent cell tower analysis.

26.     The misconduct was so pronounced that Defendants Varga and Adduci were removed from the case in 2022 and a circuit court judge agreed to conduct an evidentiary hearing nearly 12 years after Plaintiff's indictment to explore allegations of constitutional violations under *Brady, Youngblood* and *Trombetta.*

27.     The day before that hearing was scheduled to commenced, Defendants Varga and Adduci retained counsel who filed a motion to quash subpoenas that demanded their appearance and testimony in connection with their involvement and knowledge of misconduct. When the circuit court denied the motion and ordered them appear to give testimony. The CCSAO dismissed all charged against Plaintiff and Colon.

28.     Plaintiff was released from custody that day on June 21, 2023 - having served nearly 12 years in the Cook County Jail never having been brought to trial.

**JURISDICTION AND VENUE**

29.     This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of state law of Plaintiff's rights as secured by the United States Constitution as well as the deprivation of rights under Illinois state law.

9

30.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1367. Venue is proper under 28 U.S.C. §1391(b), because the parties reside in this judicial district, and the events giving rise to the claims asserted herein occurred in this judicial district.

## PARTIES

31.     Plaintiff Tyrone Clay is a 41-year-old African American man who spent 12 years detained in the Cook County Jail charged with a crime he did not commit.

32.     At all relevant times hereto, Defendants Noradin, Cirone, Brogan, Walsh, Keller, Adams, Spanos, Green, Bartik, Graham, Perez, Flak, Gilger, Hillman, McDermott, Leavitt, Folino, Inzerra, Alvarez, Balodimas,  Yamashiroya, and McCarthy (the "Police Officer Defendants" or "Defendant Officers") were members of the Chicago Police Department. Each of these defendants conspired with one another and with other persons, known and unknown, to conceal and fabricate evidence, manipulate witness testimony, coerce fabricated statements, and maliciously prosecute Plaintiff for the murder of Clifton Lewis.

33.     Defendants Dillon, Brassil, Varga, and Adduci (the "Defendant Prosecutors"), at all relevant times, were Assistant Cook County State's Attorneys. The Defendant Prosecutors, while acting in an investigatory fashion, procured a fabricated statement from Plaintiff, knowingly presented false grand jury testimony, and suppressed exculpatory evidence both pre and post indictment. Defendants are sued for conspiring with the Defendant Officers to frame Plaintiff while acting in an investigatory capacity and without probable cause to believe that Plaintiff committed a crime.

34.      Defendant City of Chicago is an Illinois Municipal Corporation, which employs or employed the Police Officer Defendants at the time of the events giving rise to this suit.

35.     Cook County is a governmental entity operating within the State of Illinois, which consists in part of the Cook County State's Attorney's Office. At all times relevant to this action, Cook County and the Cook County State's Attorney's Office were responsible for the acts of its employees. At all times relevant to this action, Cook County was the employer of Defendants Dillon, Brassil, Varga, and Adduci and are necessary parties to the lawsuit.

36.     Each of the individual Chicago Police officer defendants are sued in his individual capacity, and each acted under color of state law and in the scope of his or her employment while engaging the actions alleged in this Complaint.

## FACTUAL ALLEGATIONS

### A.     The Murder of Clifton Lewis

37.     On December 29, 2011 at 8:30 p.m., two masked gunmen entered a convenience store on the west side of Chicago called the M & M Quick Mart. During the course of robbing the store, they shot and killed off-duty Chicago Police Officer Clifton Lewis who was moonlighting as a security guard.

38.     Three weeks earlier on December 9, 2011, the M & M had been robbed in a nearly identical manner by two masked two gunmen. During that robbery, a different Chicago Police Officer Craig Williams was working security and had chased the offenders out of the store shooting at them.

### B.     CPD's Initial Investigation

39.     The top brass of CPD were informed within 90 minutes of the shooting that the perpetrators were "2 male blacks" and that there might be a connection to the attempt robbery from weeks earlier. CPD Superintendent Defendant McCarthy immediately became involved in the investigation. Only hours after the murder, Defendant McCarthy sent a message throughout

the Department that "[w]e will not tire in our efforts to work to find the individuals responsible and bring them to swift justice."     40.     Defendant McCarthy received a video of the shooting and was concerned that it had sparked rumors that the shooting was a "hit" and not a robbery gone wrong because "it was a cold-blooded, fast moving murder." Defendant McCarthy made clear that he wanted to dispel that rumor as quickly as possible, and encourage and praised the rapid charges against Colon and Clay despite the problem with the "evidence" against them.

41.     Video surveillance from inside the store captured the robbery and shooting. Although the gunmen wore ski masks, video surveillance and witness accounts suggested that one of the gunmen was an African American man and the other gunman had a light complexion with unknown ethnicity.

42.     CPD also obtained video surveillance in the alley behind the M & M Mart that captured an image of a car thought to be connected to the offenders. The car appeared to be a Dodge Intrepid, possibly silver or gray in color.  Police reports reflect that CPD was canvassing for a gray or silver Dodge Intrepid on January 1, 2012 in the North Austin area.

43.     CPD developed initial leads suggesting that the robbery/murder was carried out by members of the Four Corner Hustler street gang which operated in the area of M & M. Witnesses disclosed to CPD that Lewis was not the intended victim of the shooting and that the shooters mistakenly believed that Lewis was officer Williams who had foiled the robbery attempt weeks earlier.

44.     Chicago Police officers arrested two Four Corner Hustlers named Devin Boyles and Shaveaz Wilson who had been implicated in the December 9, 2011 robbery of the M & M Mart. Unbeknownst to Plaintiff and his criminal co-defendants, Boyles and Wilson were investigated as possible offenders in the Lewis homicide. Police reports and additional

investigative materials related to Boyles and Wilson, including MUDD/TOLLS, subscriber information, cell tower information, and cell data records were concealed from Plaintiff until 2022. Original cell phone records for these potential offenders were eventually destroyed altogether prior to their disclosure to Plaintiff.

45.     CPD also began to search its databases for owners and any police contacts with individuals associated with a Dodge Intrepid of gray or silver color. That investigative task turned up Alexander Villa's name on December 30, 2011, but he was disregarded as a person of interest since he was a light-complected Hispanic who lived in the Humboldt Park area and was affiliated with the Spanish Cobra street gang, not a Four Corner Hustler.

**C.     CPD Effectuates a Racial Dragnet of Hispanic Men in Humboldt Park after a Tip**

46.     Immediately after Lewis's murder, CPD Gang Enforcement working in Area Five were directed to turn their attention "ONLY" to generating leads in the Lewis homicide. CPD planned to overwhelm the Austin area with indiscriminate, pretextual "buy/bust" operations for the purpose of interrogating arrestees to develop leads about the Lewis homicide.

47.     On January 3, 2012, two African American men from the Austin neighborhood were arrested as part of the "buy/bust" operation and were "debriefed" about the Lewis homicide. They allegedly told investigators that the perpetrators of the Lewis shooting were Hispanic, possibly Puerto Rican from Humboldt Park.

48.     This uncorroborated tip led CPD to focus on possible Hispanic suspects in the Humboldt Park area. Officers were highly skeptical of this tip, calling it "some bullshit." As a result of this "bullshit" tip, Villa, a ranking member of the Spanish Cobra street gang and light-skinned Hispanic man from Humboldt Park who owned a silver-colored Dodge Intrepid became a focus of the investigation.

D.      **Edgardo Colon's Arrest and Subsequent Interrogation**

49.      As part of their racial dragnet operation, Chicago police officers made a pretextual traffic stop of a car containing three young Hispanic men heading east on the 3700 block of West Fullerton Avenue (the Humboldt Park area) on the evening of January 3, 2012.

50.      Chicago Police Officer Oppedisano questioned the occupants of the car and ran their names through CPD's data base. Officer Oppedisano learned that all three occupants were members of the Spanish Cobras street gang and that Colon was on probation.

51.      Officer Oppedisano claimed that she observed Colon seated in the front seat of the car and place a handgun in the cupholder in the front console of that car. These statements were false. Colon was seated in the rear of the car and a firearm was discovered underneath the front passenger seat of the car.

52.      Colon was nonetheless arrested for possessing the gun and transferred to Area Five Detective Division.

53.      Consistent with CPD orders to interrogate all arrestees about the Lewis homicide, Defendants Perez and Hillman began to question Colon about the Lewis murder on the evening of January 3, 2012. The Defendants falsely told Colon that they "knew" the shooters were Spanish Cobras and they needed Colon to cooperate with their investigation.

54.      The statement was false. There was no objective evidence suggesting that members of the Spanish Cobra street gang had anything to do with the shooting of Lewis. Even CPD officers scoffed at the theory that a Spanish Cobras would travel several neighborhoods over to Four Corner Hustler gang territory to rob a random convenience store and shoot an off-duty police officer. The absurdity of the theory did not stop Defendants Perez, Hillman, Noradin, and Cirone from endeavoring to obtain false admissions from Colon to support it.

55.     Defendants Perez and Hillman falsely told Colon that they knew that a ranking Spanish Cobra named Alexander "Flip" Villa was involved in the shooting and that video surveillance backed it up. The Defendants offered Colon the opportunity to buy his way out of trouble by adopting their hunch as his own.

56.     Defendants Perez and Hillman, under the supervision of Defendants Noradin and Cirone, pressured Colon to adopt a story that was nothing more than a guess that Villa was the lighter-complected shooter in the Lewis homicide. Colon maintained that he had no knowledge that Villa was involved in the shooting and that he was not even friends or a close associate of Villa.

57.     Although both men were Spanish Cobras, Colon and Villa were not friends and did not belong to the same set of the gang. The Spanish Cobras is a large street gang that operated in Humboldt Park and other neighborhoods, but not the Austin neighborhood.

58.     Defendants Perez, Hillman, Noradin, and Cirone did a background check of Villa and learned through CPD's CLEAR system that Villa "associated" with two African American men, also Spanish Cobras, named Melvin DeYoung and Tyrone Clay, the Plaintiff.

59.     Having learned through its database that Villa (a light-skinned Hispanic man) and DeYoung and Clay (both African American men), associated with each other as Spanish Cobras, the Defendants went to work to coerce Colon to implicate the three men in Lewis' shooting.

60.     To be clear, the only evidence that Defendants had developed to support the "theory" of Villa, DeYoung and Clay's involvement was: (1) a vague (and self-serving) "tip" that a Hispanic person from Humboldt park was responsible for the shooting: (2) Villa was a Hispanic gang member from Humboldt Park who had the similar or same make of a car that was

observed in the alley in and around the time of the shooting; and (3) Villa associated with two African-American Spanish Cobra gang members named Melvin DeYoung and Tyrone Clay.

61.     Even though the neighborhood of Humboldt Park had a population of roughly 55K people, mostly of Hispanic ethnicity, CPD targeted Villa as the perpetrator because he was a Hispanic gang member and drove a gray or silver Dodge Intrepid. Plaintiff was implicated for no reason other than his alleged "association" with Villa.

62.     Over the course of 48 hours, Defendants Perez and Hillman used various coercive tactics to attempt to get Colon to implicate Villa, DeYoung and Clay, including threatening to have his child taken away by DCFS, taking his mother's Section 8 housing away, and agreeing to drop his gun charges. Defendants arrested and detained Colon's girlfriend in an unsuccessful effort to force her to make incriminating statements against the targets of the investigation.

63.     At one point, Colon attempted to placate the Defendants by providing them with information that he had read in a newspaper article earlier that day about the shooting. But Colon could provide no information other than what was being reported in the news.

64.     When Defendants Perez and Hillman could not break Colon, Defendant Balodimas took over as "bad cop" and started threatening Colon with federal gun charges if he did not cooperate and "admit" Villa, DeYoung, and Clay's role in the shooting.

65.     The interrogation became so coercive that Colon began to feel physically ill. The Defendants had to take Colon to the hospital because he started feeling dizzy, nauseous, and light-headed, symptoms associated with severe stress.

66.     The Defendants searched Colon's phone during the course of the interrogation and learned that Colon had no communications with Villa, DeYoung, or Plaintiff at the time of the shooting *or at any time.* Indeed, none of the men were saved as contacts in Colon's phone.

16

67. To end the interrogation, Colon eventually caved and began telling the Defendants information that he believed they wanted to hear, namely that Plaintiff had *told* him that he (Clay) and Villa committed the robbery and that DeYoung was the driver.

68. Having coerced Colon into falsely implicating Villa, DeYoung, and Clay, the Defendants brought Defendant Dillon into the interrogation room to hear the "story." Defendant Dillon knew that Defendants Perez, Hillman, and Balodimas had utilized coercive tactics likely to produce false statements. Specifically, Defendant Dillon was present during a significant portion of the interrogation and knew that the Defendants had made false statements to Colon about their knowledge about the shooting, had threatened Colon's daughter, and had made false promises to not charge him with the gun case while also threatening to lodge federal charges against him.

69. Defendant Dillon knew that Colon had experienced the physical effects of a highly coercive interrogation and knew that the Defendant Officers were using coercive tactics designed to overcome Colon's will. Defendant Dillon also knew that the Defendants had not activated any video equipment to record the statement for the purpose of concealing the Defendants' coercive tactics and exculpatory evidence.

70. Defendant Dillon saw with his own eyes that Colon was suffering the psychological and physical effects of a coercive interrogation but directed the Defendants to continue the interrogation because there were "too many holes" in the story. Additionally, Colon had failed a polygraph examination that implicated Plaintiff. Defendant Dillon did not instruct the Defendants to activate the ERI but rather encouraged the Defendants to continue their coercive interrogation.

71.     Defendant Dillon knew that there was no objective evidence pointing at the Spanish Cobras as the offenders of the shooting; he knew that Colon's phone showed no relationship with Villa, Clay, and DeYoung; Dillon knew that Colon's statements were contrary to known information about the shooting. In short, Dillon knew that no probable cause supported Colon's continued detention and that Colon was being forced to adopt a story that was unsupported by any objective evidence to appease the abusive Defendant officers. Knowing all this, Defendant Dillon did not stop the interrogation by Defendants Perez, Hillman, and Balodimas. Rather, he directed the Defendants to continue their unlawful interrogation to get the statement irrespective of its truth.

72.     Defendant Dillon also advised the Defendants that Colon's statements would be more valuable if Colon admitted some personal involvement in the crime. Defendant Dillon has previously engaged in this conduct where, along with Chicago Police officers, he helped coerce a fabricated statements from a witness named Francisco Vicente in the wrongful convictions of Armando Serrano and Jose Montanez. *Serrano v. Guevara,* 2020 U.S. Dist. LEXIS 98130. s

73.     Defendants Cirone and Noradin, with the green light of Defendant Dillon directed the arrest of Plaintiff, DeYoung, and Villa even though no probable cause existed to support the arrest. The Defendants knew that Colon had not provided any information about *who* was involved in the crime and that the Defendants had introduced the information to Colon and had spent 48 hours coercing him into repeating it which he largely resisted.

74.     Tellingly, Defendants did not initiate Electronically Recorded Interview ("ERI") equipment over the course of the preceding 48-hour interrogation. Had Colon made voluntary statements implicating *anyone* in the Lewis shooting, there can be little doubt that the ERI would have been activated.

18

**E.    The Defendant Officers Need More Time To Coerce a Statement from Colon so They Devise a Plan to Fabricate a *Gerstein* Hearing to Extend His Interrogation. Judge Chiampas Gives the Defendant Officers her Blessing to Falsely Report She Made a Probable Cause Finding and Agrees to Back up the False Statements If Ever Asked.**

75.    Defendants Dillon, Cirone, Noradin, Hillman, Perez, Alvarez, and Graham knew that under Illinois law, they were obligated to take Colon before a judge for a hearing within 48 hours of his arrest for the UUW and charge him. Defendants knew that pursuant to Illinois law (and the United States Constitution) Defendant was to be brought before a judge, informed of the charges, provided with a *written* copy of the charges, informed of his right to counsel, appointed a public defender if he could not obtain his own counsel, and given a detention hearing.

76.    Defendants knew that they did not have probable cause to arrest Colon for any involvement in the Lewis murder and could not detain him for greater than 48 hours on the gun charge under 725 ILCS 5/109-1(a). Defendants also know that if they complied with the law and Colon had a proper hearing on the gun charge, their access to Colon would come to an end and they would lose their ability to leverage the gun charge in an effort to coerce statements about Lewis's murder. If Colon was brought before a judge where he was told of his right to counsel, he would likely invoke his right to counsel and the interrogation would have to cease.

77.    Having failed to obtain inculpatory statements from Colon or even any recorded statements implicating Plaintiff, Defendants sought to continue their abusive interrogation of Colon. Defendants understood that the entire investigation would come to a screeching halt if Colon was brought for a *Gerstein* hearing and that they would also have to release the Plaintiff

who had not provided an inculpatory statement and whose arrest could only be justified by the false and coerced statements of Colon.

78.    Defendant Officers also knew that there was a duty-judge at 26th street assigned to conduct *Gerstein* hearings and that if they brought Colon to 26th street for a *Gerstein* hearing, the duty-judge would likely follow the statutory requirements of advising Colon of the charges against him and appointing him counsel. Defendants could not risk this. So, Defendants came up with a plan to prevent Colon from having any *Gerstein* hearing so they could continue their prolonged interrogation of him which would become increasingly abusive and ultimately lead to his false confession and false charges against both Plaintiffs.

79.    In and around the late morning of January 5, 2012, the Defendant Officers, including Defendants Cirone and Perez contacted Judge Chiampas who was *not* the duty-judge assigned to hear *Gerstein* hearings at 26th street. They generally explained that they were close to breaking the Lewis homicide and needed her help to prolong an interrogation of someone in custody (Colon). Judge Chiampas agreed to help violate Colon, Clay, and any arrestees' constitutional rights if it meant helping the cops close the Lewis homicide.

80.    Judge Chiampas was a former prosecutor who worked closely with Chicago police officers and was good friends with Defendants Cirone and Noradin. Judge Chiampas had previously communicated to Defendants Cirone and Noradin, and the Defendant Prosecutors, that they could count on her to facilitate their unlawful and/or unconstitutional conduct. She was the go-to person for any search warrant that needed rubber-stamping, and she had previously expressed and shown her willingness to facilitate and/or cover up police misconduct. In fact, she proudly announced *publicly* at a State's Attorney party attended by her prosecutor and police officer friends that she would "always have their backs no matter what."

20

81.     She followed through with that promise when the Defendant Officers informed Judge Chiampas that they were just going to *falsely* report (and *falsely* testify if necessary) that they brought Colon for a *Gerstein* hearing before her on January 5, 2012, and *falsely r*eport that she made a probable cause finding.

82.     Judge Chiampas responded by telling the Defendant Officers, in sum and substance, that they had her permission to falsely claim that she conducted a *Gerstein* hearing and falsely claim that she made a probable cause finding even though neither happened or would happen. Judge Chiampas also promised that she would verify the false story if asked. At no time did Judge Chiampas ask to hear any facts about the charge for which Colon was arrested, and the Defendant Officers did not tell her a single fact about the charge for which Colon was charged and arrested.

83.     After getting Judge Chiampas's assurance that she would falsely attest to conducting a *Gerstein* hearing and making a finding of probable case, the Defendant Officers began to create a false paper trail so they could credibly tell the false story at a hearing or trial if necessary. At Defendants Cirone and Perez's direction, Defendants Graham and Alvarez drove Colon to 26th street. They brought him to the basement of the building for a short period and then brought him back to Area Five.

84.     The Defendant Officers falsely reported that Colon was brought before Judge Chiampas for a *Gerstein* hearing and that she made a probable cause finding. The statements were entirely fabricated made by the Defendant Officers with express assurances by Judge Chiampas that she would falsely corroborate the false statements if and when asked, including if called to testify at a pre-trial hearing. In reality, no *Gerstein* hearing occurred, and no probable

cause finding was made by anyone including Judge Chiampas. In fact, at no point did Judge Chiampas ask, learn or hear a single fact about the charge for which Colon was arrested.

**F.  Colon's Continued Interrogation and False Confession**

85.    After returning from a trip to the basement at 26th street, Defendants continued their coercive interrogation of Colon. Defendant Brassil was present at Area Five and helped oversee Colon's continued and highly coercive investigation. Defendant Perez told Colon he would help Colon go home if he just admitted to being in the car. At roughly 9:40 p.m. on January 5, 2012, Colon's will was overcome. Colon broke down in tears and agreed to do as the Defendants demanded. Only then was an ERI activated.

86.    Defendants Perez and Hillman rehearsed Colon's statement off camera until he could repeat a story that was consistent with the store video surveillance. When Colon guessed at evidence (like the color of Villa's car), Defendants corrected him. Colon asked for a lawyer several times during the course of this rehearsal period and even when the ERI was rolling.

87.    After Colon told Defendant Perez, "get me a lawyer, man" Defendant Perez ignored the request and told Colon that he would "talk to the State's Attorney, okay?" The interrogation continued and at one point Colon declared on video, "I'm implicating myself because I want to get out of here." Colon told the Defendants that he was a "compulsive liar" and that he had been lying: "I'm thinking that's the fastest way to get out of here, so I'm telling you, you know what I'm saying, what you wanna hear so I can get the f*** out of here."

88.    Colon made a second request for a lawyer saying, "Is there any way that we can get like a public defender to come in-" Defendant Perez cut him off stating "hold on- hold on- hold on- Listen. Cool it" Colon then asked for food, having not eaten in days. Defendant Perez

told Colon he wanted to help him by getting him food but needed him to say whether he was driving the car. Colon responded "yeah" and he was then provided with food.

89.     At 12:42 a.m. on the morning of January 6, 2012, Colon asked to go to the bathroom where he vomited and then was returned to the interrogation. Colon asked for a lawyer yet another time. That request was ignored. By 4:00 a.m. on January 6, 2012, Defendants successfully broke Colon's will and Colon repeated the manufactured story to felony review assistant state's attorney Defendant John Brassil. Defendant Brassil had been present for the duration of Colon's coercive interrogation after his return from the sham *Gerstein* hearing. He directed and assisted the Defendants in their coercive interrogation of Colon. After providing the false confession in the presence of Defendant Brassil, Colon was taken to Resurrection Hospital.

90.     Colon's "confession" was later suppressed by the appellate court. *People v. Colon,* 2020 IL App (1st) 172627-U.

**G.     The Torture and Coerced Statement of Melvin DeYoung (his First Illegal Interrogation)**

91.     On the morning of January 5, 2012, DeYoung was arrested and transported to Area Five at roughly 6:00 a.m. After gaining "consent" to search his home, DeYoung was arrested on a pretextual cannabis charge for the purpose of interrogating him about the Lewis homicide. Defendants Falk and Gilger conducted the majority of his interrogation over the course of two days under the supervision of Defendants Noradin and Cirone. Defendant Brassil was present and oversaw much (if not all ) of DeYoung's coercive and abusive interrogation.

92.     Defendant also arrested DeYoung's wife, Ydira, who was interrogated at Area Five over the course of two days notwithstanding her clear status as a witness. Defendants falsely claimed that Ydira voluntarily stayed at Area Five subjected to interrogation for two days.

23

Defendants routinely and regularly lied in police reports when they claimed that witnesses voluntarily remained at police stations for days on end. Like many witnesses, including the criminal defendants' girlfriends and friends, her questioning can only be characterized as coercive. She would later file an OPS complaint against the detectives in this case.

93.     The 683-page ERI transcript of DeYoung's two-day interrogation overwhelmingly demonstrates that detectives psychologically and physically tortured him while feeding him a narrative that he was forced to repeat to extricate himself from abusive police conditions and receive needed medical.

94.     DeYoung is a Type 1 Diabetic who requires five shots of insulin a day. His insulin requirements are specific to his condition. During his lengthy interrogation, DeYoung requested access to his insulin medication but his request was denied. Instead, Defendants Falk and Gilger remained in control of DeYoung's access to insulin, taking him to the hospital three times during the course of two days for insulin shots. Although DeYoung did not fall into a diabetic coma, he was sufficiently uncomfortable and feeling the effects of being denied his regular insulin treatment. The interrogation was particularly coercive where Defendants made it clear that DeYoung's ability to access insulin was entirely dependent on them which they provided at their whim.

95.     For two days, DeYoung repeatedly denied any knowledge or involvement in the death of Lewis. Defendants Falk and Gilger threated DeYoung both explicitly and implicitly telling him he was going to prison for the rest of his life if he did not regurgitate a story detectives fed to him. The ERI shows that detectives provided DeYoung with the story they wanted him to repeat - not the other way around.

96.     In an effort to scare DeYoung into adopting their story, Defendants Falk and Gilger told DeYoung that his co-defendants implicated him, were working out a deal for themselves, and threated that he was "gambling with his life," and "throwing his whole life away" if he did not adopt the story fed to him.

97.     Defendants falsely told DeYoung he failed a polygraph test when they knew that his test results were inconclusive because of his medical condition and the fact that he was suffering the effects of not receiving his normal, insulin treatment.

98.     DeYoung repeatedly told Defendants that he did not even know Colon (Colon's phone number was not in DeYoung's phone or any defendants' phone for that matter); and was not involved in any robbery or shooting, including by being in the car with Colon, Plaintiff, or Villa. Defendants brow beat and terrorized DeYoung, calling him a liar over and over when he denied involvement in and knowledge of the crime.

99.     Defendants attempted to minimize their theory about DeYoung's "role" in the crime and falsely promised DeYoung leniency if he adopted the story detectives fed to him. When DeYoung refused to adopt their story, Defendants threatened DeYoung with more serious consequences, repeatedly telling him his life was over.

100.     DeYoung was unable to stop the abusive interrogations even after a lawyer appeared on his behalf, because his invocations were ignored and mocked. Defendants made it clear to DeYoung his assertion of his right to counsel would not be honored.

101.     Defendants' enhanced pressure on DeYoung were not captured by ERI during DeYoung's three trips to the hospital when detectives rode with DeYoung in an ambulance. At one point in the elevator on the way to the hospital, an officer shouted in DeYoung's face that he was a "piece of shit" and that he was going "die."

102.    After riding in the ambulance with the Defendants on the third trip to the hospital, DeYoung was suddenly agreeable to giving a statement that he was in a car with Colon, Plaintiff, and Villa upon his return to Area Five. During that ambulance trip, Defendants Falk and Gilger threatened DeYoung and intimidated him while brazenly feeding him a story they wanted him to repeat upon return to Area Five.

103.    Even after a "prep session" in the ambulance (which was not recorded by the ERI) the detectives still had to feed DeYoung even the most basic details of the crime as reflected on the ERI. At one point, DeYoung asked detectives to turn off the recording so he could consult with them about what they wanted him to say. And eventually, DeYoung declared he couldn't "go on with this" because he didn't know what happened. If the ERI did not capture serious police misconduct, it would be laughable on account of the absurdity of it all.

104.    At one point, DeYoung's attorney showed up and DeYoung refused to answer the detectives' questions. When detectives exited the room, DeYoung faced the camera and declared, "It's all a lie!"

105.    The Constitution be damned, detectives continued their coercive interrogation of DeYoung at 4:00 a.m., DeYoung again told them he had no involvement or knowledge of the crime and that the officers were coercing him and feeding him information that he had no independent knowledge of.

106.    DeYoung's interrogation is a masterclass in violating a suspect's constitutional rights and obtaining unreliable information. To the extent DeYoung made inculpatory statements or statements suggesting his involvement or knowledge of the crime, the statements were clearly involuntary and the Defendants knew it.

26

107.     Defendant Brassil was present and observing DeYoung's coercive interrogation, knowing that it had produced false statements. Defendant Brassil, like the Defendant Officers, trampled DeYoung's constitutional rights, and knew as much as evidenced by his decision not to charge DeYoung with the Lewis homicide. Instead, DeYoung was charged with a cannabis offense. After making bond, he was released from Cook County Jail.

108.     CPD's egregious mistreatment of DeYoung did not end there. He would later be tortured as a "witness" at Homan Square where no ERI exists to memorialize that torture.

**H.     Plaintiff's Coerced Confession**

109.     Like Villa and DeYoung, Plaintiff was arrested at his home during the early morning hours of January 5, 2012.

110.     Defendants Noradin, Cirone, Perez, Hillman, Graham, Alvarez, Dillon, and Brassil knew that Colon had repeatedly denied knowledge about the Lewis homicide and that the Defendants introduced a false narrative to Colon about Villa, DeYoung, and Clay being responsible for the crime based on nothing more than the fact that Villa was Hispanic and DeYoung and Clay were African American and were known associates, a vague tip that the shooting was carried out by a Hispanic person from Humboldt Park, and the fact that Villa drove a car similar in make to the one observed in video surveillance outside the M & M.

111.     A highly coercive interrogation of Plaintiff commenced at roughly 7:00 a.m. on January 5, 2012, and continued until the early morning hours of January 7. Plaintiff's interrogation of Plaintiff was conducted by Defendants Noradin and Keller, along with Defendants Adams, Spanos, Green and Bartik. It was supervised or observed by, *inter alia,* Defendants Cirone and Brassil. Defendant Brassil observed and directed Plaintiff's interrogation.

27

Case: 1:23-cv-16799 Document #: 175 Filed: 05/01/25 Page 28 of 79 PageID #:2473

112.    The 888 page ERI transcripts reflect that out of the gate, Defendant Noradin told Plaintiff that he is going to read him his *Miranda* warnings and that he [Plaintiff] *has* to say "yes" after he reads him his warnings. Neither Defendant Noradin nor Keller, Adams, Spanos, Green or Bartik told Plaintiff that he could say "no" if he did not understand his rights.

113.    Plaintiff had severe intellectual disabilities and his IQ was tested at 66.

114.    For hours, Plaintiff denied any knowledge or involvement in the Lewis homicide. At 1:59 p.m. on January 5, Plaintiff repeatedly stated that he did not do anything, saying "I'm gone from I don't even want to talk no more." Defendants ignored his clear invocation of his right to remain silent and continued to interrogate him.

115.    A couple of minutes later, Plaintiff said, "Man, I'm gone [inaudible] I don't need to talk no more 'cause it aint doing nothing but blowing me man 'cause I know I ain't do it real." Defendant Noradin responded, "You might've went there just to rob the place." Plaintiff said, "I ain't rob nothing. I'm innocent until proven guilty,"

116.    At 2:10 p.m., the following exchange occurred:

Q:      You gotta do some [soul-]searching. Think about your mother. Think about your kids. Think about your girlfriend.

A:      I ain't worried about them I'm gonna see them. 'Cause I ain't do nothing.

Q:      Where you gonna see them?

A:      Call my momma tell her get me a lawyer Joe 'cause I ain't do nothing.

Just after, at 2:11 p.m., Plaintiff said "I don't even want to talk." At this point, the detectives left the room for approximately two-and-a-half hours.

117.    Plaintiff maintained that he was not present in the car the night of the shooting for approximately another nine hours. At 2:01 a.m. on January 6, detectives told Plaintiff that he would be "taking the weight of this whole thing" and Plaintiff responded:

28

A:     I ain't taking no weight of nothing, Joe, I'll get me a lawyer—

Q:     You are going to.

A:     'cause I ain't going. I ain't going man, I'm not going.

Q:     You don't have that option right now.

A:     Man, I ain't going.

Q:     You don't have that option.

118.    Defendant Noradin and other detectives repeatedly called Plaintiff a liar and that he would take the "weight of the crime." Finally, at 2:08 a.m., Plaintiff began to tell his interrogators what they wanted to hear. But even then, he got key details wrong until they coached him to say the "right" thing. For example, when Plaintiff said that "Peto" was driving and "Sweat Pea" was in the back seat, they walked Plaintiff through the story until he got Defendants' version "right." Likewise, when Plaintiff said that he shot two rounds outside the store, they walked him through it until he said that he shot the gun inside the store.

119.    Presiding Judge Reddick of the Circuit Court of Cook County suppressed Plaintiff's statements after an evidentiary hearing, finding that Plaintiff did not make a knowing and intelligent waiver of his *Miranda* rights. The court also found that Plaintiff had unequivocally asserted his right to remain silent and that the interrogating detectives did not honor that assertion. The court noted that Plaintiff's "will was overborne under the totality of the circumstances." The Illinois Appellate Court affirmed. *People v. Clay*, 2020 IL App (1st) 190986-U

I.    **Villa's Arrest and Release from Custody**

120.    Villa was also arrested on the morning of January 5, 2012. Defendants Folino and McDermott subjected Villa to a brutal 48-hour interrogation. Even before he was taken to the police station, Villa was physically abused. Defendants continually ignored Villa's assertion of

his constitutional rights. Eventually, the interrogation ceased with Villa never making incriminating statements. Villa was taken to the hospital for medical attention after his 48-hour abusive interrogation.

121. Defendants Graham and Alvarez arrested and interrogated Villa's girlfriend Monica Rivera in an attempt to develop incriminating evidence against Villa and Plaintiff and Colon. The Defendants falsely claimed that Rivera consented to remain at Area Five for an extended period of time. Defendants arrested each and every one of suspect's girlfriends, subjecting them to unlawful interrogations in hopes of coercing them into falsely implicating their boyfriends and using them as pawns to pressure Plaintiff, Colon, DeYoung, and Villa into making inculpatory statements.

**J.      CPD Launches a Secret Multi-Jurisdictional Operation Against Spanish Cobras for the Sole Purpose of Developing Evidence against Villa and Building a Case Against Plaintiff and Colon - All of Which Was Concealed from Plaintiff and his Criminal Co-defendants.**

122. On January 4, 2012, CPD made the decision to "go after" the Spanish Cobras over the Lewis homicide. As one commander wrote later that month:

> *Due to the involvement of the Spanish Cobras street gang in this murder, an all-out effort has been initiated against this gang* for the purpose of generating witnesses or others who may have information that may lead to the arrest and conviction of the last offender. To this end *a comprehensive plan has been created targeting Spanish Cobra gang members*, their associates and their territories. A copy of that plan is available upon request. (emphasis added).

123. This "comprehensive plan" was called "Operation Snake Doctor." A January 27, 2012 email regarding "Operation Snake Doctor" stated: "our main targets are the 6-7 guys on that small chart that surround Alexander Villa 'flip'. We are planning to go after the entire upper chain of command/board of directors.

124.    "Operation Snake Doctor" quickly gathered steam and evolved into a massive, inter-agency investigation involving the CPD, the CCSAO, and cooperation from the FBI, DEA, and DOJ federal agencies. The Defendants never disclosed to Plaintiff or his criminal co-defendants that CPD, the CCSAO with the assistance of federal agencies initiated a massive gang operation that had the primary, if not sole, purpose of developing evidence against the Plaintiff and his criminal co-defendants. Indeed, there was a purposeful and malicious effort on the part of CPD and the CCSAO, including Defendants Varga and Adduci, to conceal the existence of the operation, including all exculpatory evidence that was developed during Operation Snake Doctor.

125.    Operation Snake Doctor had its own case number and case file that served as a parallel filing system for any reports pertaining to the Lewis homicide that might be exculpatory. The operation and all reports prepared in connection with the operation were concealed from Plaintiff and his criminal co-defendants until 2022 when an attorney for Villa uncovered it.

126.    Defendants Varga and Adduci participated directly in this parallel investigation, including by assisting interrogations, debriefings, and other investigative acts - none of which were disclosed but were instead hid in a parallel investigative file.

127.    When an individual was arrested as part of "Operation Snake Doctor" and gave information that was exculpatory to the Plaintiff, Villa, or Colon, Defendants Varga and Adduci (and the Defendant Officers who were present) chose *not* to memorialize that information.

128.    If there was any doubt about the purpose of "Operation Snake Doctor," an email thread among "Operation Snake Doctor" operatives says everything that needs to be said about the purpose of this parallel "gang operation." Before Villa's arrest, the Snake Doctor cops learned that Villa had been stabbed, seemingly by members of his own gang. The gang officers express

great delight in the attempted murder of Villa and pat themselves on the back for having caused the crime. Gang Officer Dedore states:

> I believe Operation "Snake Doctor" and 6580 has to take credit for this. Cline and company tell each Cobra that every time a Cobra goes to jail its Flip's fault. Unless I got the facts wrong (I often do), Flip was targeted by other Cobras. His associate left unscathed. It sounds like that the Cobras are getting the word.

129.    Prior to 2022, neither Plaintiff nor his criminal co-defendants had any knowledge of this parallel "gang operation" nor did they know that CPD was actively trying to get Villa murdered.

**K.     Before Plaintiff Was Even Charged, the Defendant Officers and Defendant Prosecutors Learned that Preliminary Cell Tower Analysis Showed that Plaintiff, Colon, and DeYoung's Statements Could Not Be True and that CPD's Theory of the Case Was Hogwash.**

130.    On January 4, 2012, the day after Colon's arrest, Defendants Brogan and Inzerra were assigned to assist in the Lewis homicide investigation. Defendant Hillman told Defendants Brogan and Inzerra to obtain court orders for MUDDS/TOLLS, subscriber information, cell tower information, and cell data records for Colon's phone number.

131.    Because Colon did not have phone numbers for Villa, Clay, and DeYoung saved in his phone and did not know their phone numbers (as they were not friends or even gang associates), Defendants obtained the phone numbers for Villa, Plaintiff and DeYoung after arresting them and via their girlfriends on January 5, 2012.

132.    That same day, on January 5, 2012, ASA Mahoney issued subpoenas for the requested information, including cell tower records for Plaintiff, Colon, Villa, and DeYoung returnable to FBI Agent Wallschlaeger who was designated to conduct an exigent cell tower analysis on the suspects' phones.

133.    The FBI secured the cell data records in less than 24 hours and the following day on January 6, 2012, Agent Wallschlaeger prepared a preliminary analysis of the call records and presented those results to Defendants Walsh, Graham, Noradin, Cirone, Brassil and Dillon. The results showed that none of the suspects (Colon, Plaintiff, DeYoung, and Villa) were at or near the M & M Mart at the time of the shooting and had not been with each other at any point during the day. In fact, initial cell tower data showed that at the time of the homicide, Colon and DeYoung were using their phones at a location miles away from the crime scene.

134.    To be clear, as of January 6, 2012, the Defendant Officers and Defendants Dillon and Brassil knew that the cell tower analysis exonerated Plaintiff, Villa, Colon and DeYoung and led to the inescapable conclusion that any incriminating statements made by Plaintiff, Colon, and DeYoung were false and a product of coercion.

135.    This discovery on January 6, 2012 should have resulted in the immediate release of Plaintiff from custody - instead the Defendants doubled down - the Chicago Way. The Defendants concealed this exculpatory evidence and continued their interrogations and eventual charging of Plaintiff and Colon. Defendant Brassil, along with the Defendant Officers, agreed to keep this exculpatory evidence a secret.

136.    Despite knowing that Colon's statements were a product of coercion and that cell tower evidence completely exonerated Colon, Defendant Brassil approved murders charges against Colon.

137.    On January 6, 2012, Colon was taken back to the criminal court building for a *Gerstein* hearing on the murder charges before the assigned judge. During that hearing, the prosecutor assigned to the courtroom repeated the false and fabricated story, green-lit by Judge

Chiampas herself, that Colon had appeared before her for a *Gerstein* hearing the day before and that she made a finding of probable cause. The statements were false.

138.     On January 7, 2012, despite the rampant misconduct that occurred, Defendant McCarthy sent an email to the Department proclaiming his "great satisfaction [ ] that two offenders have been charged in the murder of 15th District Tactical Officer Clifton P. Lewis." Defendant McCarthy went on to praise the detectives and fellow officers for their work in arresting Plaintiff.

**L.     The Prosecutor Defendants, including Defendants Varga and Adduci, Knew Probable Cause Was Lacking to Indict Plaintiff and Colon and that Exculpatory Cell Tower Analysis Exonerated Them.**

139.     Once Plaintiff and Colon made their first appearance in Branch 66 and were appointed attorneys from the office of the Cook County Public Defender ("CCPDO"), Defendants Varga and Adduci learned that they would be the lucky prosecutors assigned to prosecute the Lewis homicide.

140.     Prosecutions for officer homicides are the most coveted assignments in the CCSAO. Even before Plaintiff and Colon were indicted, Defendants Varga and Adduci were intimately involved in reviewing the evidence and assisting with the grand jury presentation that was handled by Defendant Dillon.

141.     Prior to Plaintiff's indictment and throughout the prosecutions of Plaintiff and his criminal co-defendants, Defendants Adduci and Varga used their private email addresses rather than their CCSAO email addresses to communicate with the Defendant Officers to receive and send information that they wanted to conceal from disclosure, to direct CPD's investigation of the Lewis homicide which was active and ongoing, to manufacture evidence against Plaintiff and

his criminal co-defendant, and even to edit DRAFT police reports before submission into CPDs' investigative file to excise exculpatory information.

142.    By way of example, on January 20, 2012, before Plaintiff and Colon were even indicted, Defendant Varga sent an email from his private email address to Defendant Noradin telling him that he looked at logs from Colon's interrogation and suggested to Defendant Noradin what "route" Plaintiff and Villa took to the crime scene. Defendant Varga directed Defendant Noradin to pull POD videos that would have captured these routes and asked for the cell tower information. Defendant Varga writes "Anything that corroborates what these guys are saying will be helpful." Defendant Varga sent this email to Defendant Adduci at her private email address.

143.    Consistent with Defendant Varga's direction, Defendant Noradin obtained the POD footage that had been retrieved but which failed to show Villa's Dodge Intrepid driving anywhere near or on the route proposed by Defendant Varga. Prior to Plaintiff and Colon's indictment, Defendants Varga and Adduci learned from the Defendant Officers, including Defendant Noradin, that neither the POD footage *nor* the cell tower analysis that had been prepared by the FBI did, in fact, corroborate what Plaintiff and "those guys" were saying. In fact, Defendant Varga and Adduci learned that the 2012 FBI exigent cell tower analysis and the POD footage showed the opposite, namely that the "route" proposed by Varga did not show Villa's car driving to or away from the crime scene.

144.    Defendants Varga and Adduci also learned that the cell tower analysis showed that Plaintiff and his alleged co-conspirators were not involved in the crime and were not even together on the day of the shooting *at any point*. Defendants Varga and Adduci learned this information prior to a grand jury returning a true bill of indictment against the Plaintiff.

145.    The Prosecutor Defendants, including Varga and Adduci, knew that Plaintiff and Colon's "confessions" could not be true based on objective evidence. Rather than abandon efforts to maliciously prosecute and indict Plaintiff (and Colon) where probable cause did not exist to believe they committed the crime, Defendants Varga and Adduci commenced a 12 year odyssey to conceal and destroy exculpatory evidence, to fabricate evidence, and to conceal their own misconduct and the misconduct of the Defendant Officers and their colleagues Defendant Dillon and Brassil who also knew that no probable cause existed to justify charges against Plaintiff.

146.    Indeed, by the time Plaintiff and his criminal co-defendants learned about this exculpatory evidence over a decade later, the exculpatory POD video was destroyed and the original cell phone responses were likewise destroyed precluding Plaintiff from having independent cell tower analysis conducted.

147.    In addition to email communications from Defendant Varga's personal email address which showed his active involvement in the investigation of the case pre-indictment, Defendant Varga was identified as a recipient of all grand jury subpoena responses, including the cell phone data of Plaintiff, Colon, Villa, and DeYoung (and others). He was notified by the Defendant Officers and Defendants Dillon and Brassil that FBI Agent Wallschlaeger cell tower analysis was exonerating and that Plaintiff and Colon's "confessions" were not reliable.

148.    In other words, Defendants Varga and Adduci knew prior to indictment that there was no probable cause to support the charges. Defendants Varga and Adduci not only failed to intervene in a wrongful indictment, they actively concealed the exonerating information from the criminal justice system to ensure that Plaintiff was indicted notwithstanding the absence of probable cause.

149.    Defendants Varga and Adduci's misconduct both pre and post-indictment is staggering. What is certain is that throughout the 12 year prosecution of Plaintiff, Defendants Varga and Adduci remained actively involved in the investigation that was open and active for years. They conducted their investigative work with the Defendant Officers via private email communications that they withheld from the defense. They directly participated in editing police reports to extract or minimize exculpatory information.

150.    Indeed, in 2022, after Plaintiff, Colon, and Villa's attorneys exposed the misconduct of Defendants Varga and Adduci, the CCSAO removed them from the case. At that point, the CCSAO became more cooperative in producing information that reflected a frame up of epic proportions and which involved direct investigative misconduct of the prosecutors - not merely prosecutorial misconduct - but investigative misconduct committed by prosecutors.

151.    By way of example, on July 20, 2023, the CCSAO disclosed a document from the CCSAO files entitled "Villa Closer **UNAPPROVED**.doc" The file was a word version of a clear closed report detailing Villa's arrest on November 21, 2013. The unapproved report, in editable Microsoft Word format, contained exculpatory information that was removed from the final report.

152.    CPD's CLEAR system shows that the report was first created on September 11, 2014 by Defendants Noradin, Falk and Cirone. It was emailed to Defendant Adduci at her private email address and a copy of the report was saved by her in April 2014. Defendant Adduci made notes directly on the DRAFT clear closed report and even changed the language of the narrative to minimize the condition and functionality of Villa's hand at the time of his arrest which was critical to his defense.

153.     Whether Villa was able to do some of the physical actions that were reflected in the video of the robbery was a hotly disputed point at trial. The Defendant Officers wrote in the report that when they arrested Villa his left hand was "not functioning properly." This statement corroborated Villa's claim that he could not have jumped over the counter like the offender did in the video. Defendant Adduci changed the language in the police report to state that Villa's hand "was abnormal in appearance." In other words, Defendant Adduci completed excised information about the compromised functionality of Villa's hand to remove evidence that would support Villa's defense. It is unclear how many times Defendants Adduci and Varga edited police reports through their private email addresses.

154.     Defendants Varga and Adduci also communicated via private email concerning the parallel investigation concerning the Lewis homicide dubbed "Operation Snake Doctor." In one such email (and it is unclear how many there are), Defendant Varga discussed how CPD was monitoring Villa's Facebook account and other investigative actions that should be taken, including obtaining a search warrant for Villa's Facebook account. Defendant Officers communicated with Defendants Varga and Adduci via their private emails about consensual overhear summaries they prepared in connection with "Operation Snake Doctor" which was nothing more than a parallel investigation into the Lewis homicide, and a separate file in which to conceal exculpatory information that could be used by Plaintiff and his criminal co-defendants in their defense.

155.     Defendants Varga and Adduci abandoned their prosecutorial function prior to Plaintiff's indictment, and after, taking up an investigatory function. They concealed and destroyed exculpatory evidence prior to Plaintiff's indictment and spent 12 years keeping their misconduct concealed and engaging in a conspiracy with the Defendant Officers and their

colleagues to keep this frame up concealed. Through private emails, they were directing investigations, editing police reports, and working hand-in-hand with the police in ensuring Plaintiff's malicious prosecution and wrongful conviction (which thankfully did not occur).

**L.    Defendants Develop Even More Evidence that Plaintiff and Colon Are Innocent and that their "Confessions" Were False - All Prior to a True Bill of Indictment.**

156.    By January 12, 2012, Defendants, including the prosecutor defendants, were in possession of and were aware that cell tower analysis conducted by the FBI exculpated the Plaintiff and his criminal co-defendants and further demonstrating that their confessions were false.

157.    To be specific, the following exigent cell tower analysis was conducted using the cell phone numbers of Colon, Villa, DeYoung and the Plaintiff. The analysis showed that at 8:32 p.m., the precise time of the Lewis homicide, Colon's cell phone was miles away from the M & M. Importantly, none of the accused were shown near the scene of the shooting that evening *or with each other.* As the map reflects, it also showed Colon using his phone at 8:32 p.m. miles away from the location of the crime.



158.    On January 18, 2012, Defendant Brogan prepared a report that was labeled

**"DRAFT ONLY - NOT OFFICIAL - DO NOT DISSEMINATE"** that was purposefully

omitted from the Lewis Homicide file that expressly acknowledged the foregoing cell tower

analysis and further noted that the information had been shared with Defendants Walsh and

Brassil. This conduct took place *prior* to the Plaintiff's indictment and was known even prior to

Defendant Brassil's approval of charges against Plaintiff.

159.    This highly exculpatory evidence would not be disclosed until a decade later.

Plaintiff remained in custody during this entire period of time. Plaintiff filed numerous motions

for pretrial release which were all denied.

160.     In the interim, the original, raw data provided by the cell phone companies was destroyed. Plaintiff has *never* had the opportunity to see or review the original subpoena responses for the cell tower data.

161.     Defendants, including Noradin, Cirone, Walsh, Leavitt, and Yamashiroya also discovered on January 18, 2012 that Plaintiff was playing video game on a Playstation ("PS3") in his home. Email communications between the Defendants show that they sought to obtain the PS3 to see if Plaintiff and his criminal co-defendants had communicated with each other through the PS3. The Defendants understood, as reflected in their email communications, that PS3 Players had profiles and could send messages to other players and that their communications during active play was maintained as cloud data.

162.     On January 23, 2012, Defendants went back to Judge Chiampas to execute a search warrant for Plaintiff's PS3. Judge Chiampas approved nearly all of the search warrants during the early part of the investigation.

163.     The search warrant was executed by Defendants Cirone, Noradin, Walsh, Leavitt, Falk, Balodimas and others on January 23, 2012. Critically, the Defendants asked FBI Agent Gregory Wing who was a tech expert to accompany them to execute the search warrant so that he could immediately, on site, obtain information from the PS3 concerning whether Plaintiff was using it at the time of the crime.

164.     Agent Wing examined the device prior to the Defendants Officers inventorying it. His analysis showed that Plaintiff was playing video games and communicated with players at the precise time of the Lewis homicide. No police report documented that finding, instead each and every Defendant Officer suppressed this evidence that was dispositive of Plaintiff's innocence.

165.    The PS3 was eventually provided to the Regional Computers Forensic Laboratory ("RCFL") but the analysis sought by the Defendant Officers and conducted by RCFL was only of the console's hard drive  - not the data that was maintained in the Cloud which included Plaintiff's conversations with another on-line gamer.

166.    Defendants knew before Plaintiff was indicted that he had an airtight alibi for the time of the shooting and took efforts to conceal that evidence and eventually destroy it.

167.    Neither the Defendant officers nor the prosecutor defendants even disclosed that they had taken possession and "examined" the PS3 until over two years after Plaintiff's arrest.

168.    In 2014, Defendants eventually produced a useless report and made a copy of the hard drive for Plaintiff's complaint. But they continued to conceal the material, exculpatory evidence from the Cloud data, namely the evidence that showed that Plaintiff was actually communicating with another gamer on-line at the precise time the crime was committed.

**M.    Grand Jury Proceedings**

169.    Defendants Dillon and Brassil presented evidence to the grand jury that they knew was false and that resulted in true bills of indictment against Plaintiff and Colon.

170.    Defendants Dillon and Brassil both knew first-hand that Plaintiff, Colon, and DeYoung had been subjected to coercive and abusive interrogations that continued for days. The prosecutor defendants Dillon and Brassil possessed this information because they both participated in these interrogations. Defendants Dillon and Brassil directed the coercive interrogations of the Plaintiff, Colon, and DeYoung all while knowing that the statements obtained during those interrogations were false and fabricated and that no probable cause supported their arrests for the Lewis homicide.

171.    Defendants Dillon and Brassil were fully aware prior to the grand jury presentment that exculpatory evidence showed that Plaintiff and Colon were not responsible for the Lewis homicide and that the confession evidence was false.

172.    Specifically, Defendants Dillon and Brassil knew that exigent cell tower analysis showed that none of the criminal defendants, Plaintiff, Colon, and Villa, and the uncharged co-conspirator were near the scene of the crime. They also knew that Colon was shown to be using his phone miles aways. They also knew that cell tower analysis showed that they were nowhere near each other at the time of the crime.

173.    Defendants Dillon and Brassil knew that Plaintiff had an airtight alibi for the time of the crime, namely evidence that he was playing his PS3 at the time of the crime because his voice could be heard communicating with another gamer.

174.    Knowing that no probable cause supported charges against Plaintiff, Defendant Dillon presented false testimony from Defendant Noradin before the grand jury on February 3, 2012. Defendant Noradin falsely testified before the grand jury to, *inter alia,* the following:

- Colon and Clay along with two other co-offenders had "planned to rob at gunpoint the M & M Quick foods."

- Colon drove the other offenders to the M & M knowing they were armed and planned to rob the store while Colon acted as a lookout

- Clay and another co-offender entered the store and announced a robbery and that Clay and the co-offender shot Lewis with their firearms.

- Clay and another co-offender fled the store with Lewis's firearm in a car driven by Colon

175.    Defendant Noradin's testimony was based on coerced confessions from Colon and Clay that the Defendants knew were fabricated and a product of coercion. Defendant Noradin's

testimony was also based on the coerced statements of Melvin DeYoung that Defendants knew were false and coerced as evidenced by his declarations that his statements were untrue and the Defendants determination that DeYoung could not be charged but would he used instead as witness.

176.    When Defendant Dillon presented the false testimony of Defendant Noradin, Defendants knew that all objective evidence refuted their theory of guilt and that cell tower analysis conducted by the FBI was exonerating along with evidence retrieved from Plaintiff's PS3 which showed that he was playing video games and communicating with another gamer at the precise time of the Lewis homicide.

177.    Having been presented with false testimony and no exculpatory evidence, the grand jury returned a true bill of indictment against Plaintiff and Colon on February 3, 2012. Plaintiff was prejudiced by the introduction of false testimony to the grand jury, Defendant Noradin's fabricated testimony, and the omission of material *Brady* information. But for the fabricated evidence presented to the grand jury, Plaintiff would not have been indicted.

**N.    Exculpatory Evidence Suppressed by the Defendants Over the Next Decade and the Fabrication of Evidence Intended to Save the Sinking Ship.**

178.    Plaintiff was detained in the Cook County Jail for the almost 12 years. Plaintiff was arrested without probable cause on January 5, 2012. He was indicted on February 3, 2012 and held without bail. His many requests for bail were denied; he was eventually released from custody on June 21, 2023 after all charges against him were dismissed by the CCSAO in a manner indicative of innocence. He was never brought to trial.

179.    In addition to the exculpatory evidence detailed above that was known to the Defendants prior to Plaintiff's indictment, a mountain of exculpatory evidence was suppressed and in some instances destroyed during Plaintiff's 12-year detention in the Cook County Jail.

180.    The following is an incomplete list of exculpatory evidence that was either suppressed or destroyed by the Defendants during Plaintiff's 12-year unconstitutional detention.

- 2012 FBI Cell Tower analysis identified two Four Corner Hustlers as suspects. These suspects had homes, or their relatives' homes abutted the alley of the M & M Mart. The FBI analysis was suppressed and the cell phone records of at least one of the suspects was destroyed. Plaintiff and his criminal co-defendants were not apprised of this evidence until 2022.

- Additional evidence that pointed to Four Corner Hustlers as the culprits was suppressed until 2022. Defendant Officers, including Defendant Folino and McDermott, developed evidence that strongly suggested that the intended target of shooting was off-duty Chicago Police Officer Craig Williams who foiled a robbery attempt at the M & M three weeks prior to Lewis's homicide. The Defendant Officers focused on two suspects whose alibis for the night of the Lewis homicide could not be confirmed. Those reports and that strong evidence of alternative perpetrators was concealed from the Plaintiff until 2022.

- POD Videos that *should* have (but did not) capture Villa's Dodge Intrepid either arriving or fleeing the scene were never produced and were destroyed. Photographs that were taken from the POD footage (before it was destroyed) depict a red SUV parked near the M & M at 8:30 p.m. and leaving the scene at 8:33 p.m. - the precise time of the robbery/homicide.

- The original cell tower data responses for Plaintiff and his criminal co-defendants phones were suppressed and then destroyed. They were no longer available from the cell phone carriers by the time Plaintiff and his criminal co-defendants learned of their existence.

- The original cell tower data responses for alternative third-party perpetrator were concealed from Plaintiff and his criminal co-defendants phones; they were later destroyed. They were no longer available by the time Plaintiff and his criminal co-defendants learned of their existence.

- Defendants maintained an electronic "street file" separate from the Lewis homicide file that contained DRAFT reports that memorialized exonerating and exculpatory information, including reference to the 2012 Cell Tower analysis, interviews with Spanish Cobras who provided information suggesting that Plaintiff and his criminal co-defendants were innocent of the charges.

- Cloud data from Plaintiff's PS3 that showed unequivocally that Plaintiff was playing video games at the time of the shooting was not recorded or memorialized in any report even though the information was known even before Plaintiff's indictment when a search warrant was executed at Plaintiff's home. By the time Plaintiff's criminal counsel realized that such evidence might be available, the Cloud Data was inaccessible.

- Countless draft reports that were maintained in emails and on computers that reviewed and edited by supervisors and the Defendant Prosecutors before being submitted into the CPD electronic filing system. Indeed, in some cases, reports that allegedly documented investigative work during the early stages of the investigation in January 2012 were not submitted until 2016 - over four years later.

- In some instances, draft reports were sent to Defendants Noradin and Cirone and then returned to the reporting officers with instructions to alter the narrative to make it more damning. For example, during an interview with one of Villa's friends, the reporting detective sent a DRAFT report to Defendant Noradin. Defendant Noradin returned the DRAFT with questions on the report and the message that Defendant Cirone "said that he wanted you to fluff up Vega's interview." The Draft of the report was circulated multiple times with *substantive* admissions designed to strengthen the case against the criminal defendants. The DRAFT reports were never produced but remained in emails. This occurred on countless occasions.

181. The Defendants Officers conspired among themselves and others, at the direction of Defendant Cirone to *not* document exculpatory information and purposefully exclude exculpatory information from the homicide file.

182. On July 22, 2012, Defendant Cirone expressed dismay at an officer for memorializing a tip about the Lewis homicide. He wrote in an email to the Defendant Officers he was supervising:

> If someone is talking about the Officer Lewis murder should we be putting anything down on paper unless someone with knowledge of the case interviews the subject/offender (I have no knowledge we were ever informed that this guy was talking about the Lewis murder - I'm not saying we were not notified - as I can't tell). What if some random thug starts implicating the wrong offender, this information is going to hurt us down the line. There has to be a better alternative. I understand the concept, but **if officers start documenting unsubstantiated stories/rumors we are going to be creating additional problems for ourselves, and as your [sic] aware we have enough of those already.** I agree we should be notified, but let us determine what goes down on paper - at least in felony cases.

183. This directive from Defendant Cirone expressly instructs his subordinates *not* to document evidence that did not support the Defendant Officers' theory of guilt against Plaintiff and his criminal co-defendants. This email is an express directive to suppress exculpatory

material and reflects egregious tunnel vision inconsistent with nationally recognized police practices.

184.     The Defendant Officers, including Defendant Noradin, Falk, and Gilger, along with Defendant Prosecutors Varga and Adduci conspired among themselves and with the Defendant Officers to make another pretextual arrest of DeYoung for the purpose of interrogating him at Homan Square and coercing a false "witness" statement from DeYoung for the purpose of developing evidence against Plaintiff and his criminal co-defendants.

185.     On March 20, 2012, DeYoung was arrested again by Defendants, this time for possessing ammunition that was recovered during his January 5, 2012 arrest and search of his home. Detectives did not charge DeYoung with the ammunitions offense at the time of his January 5, 2012 arrest so they could preserve a basis to arrest him on a later date and subject him to more interrogation.

186.     The Defendant Officers, including Defendants Noradin, Falk and Gilger, consulted with Defendants Vargas and Adduci about the plan to arrest DeYoung again and take him to Homan Square for further interrogation. Because they abandoned any plan to charge DeYoung, the Defendant Officers and Defendant Prosecutors determined that they would not record the interrogation.

187.     On March 20, 2012, Defendants transported DeYoung to Homan Square, the so-called Chicago Police Department Black site, where he endured over two days of police torture by Defendants Falk and Gilger - none of which was captured by ERI equipment.

188.     Detectives proceeded to interrogate DeYoung over the course of two days in the same, even worse, manner that they did during his first interrogation. Again, denying him access to his own insulin treatments and even refusing to provide him with water and regular trips to the

bathroom. On account of the denial of insulin to DeYoung, he began experiencing expected complications, including extreme thirst, an intense need to urinate, a throbbing headache, and overall extreme physical discomfort.

189.     Throughout his two-day interrogation, DeYoung not only experienced extreme physical discomfort because of the lack of medical care, he was terrified of slipping into a life-threatening diabetic coma on account of the detectives having complete control over his access to insulin. DeYoung previously experienced diabetic comas and knew that lack of insulin is a life-threatening affair for him.

190.     DeYoung repeatedly asked for counsel but his requests were denied. Detectives communicated to DeYoung that no matter how many times he invoked his constitutional rights to protect himself, his requests would be denied. DeYoung felt complete hopelessness during his *second* two-day interrogation.

191.     The Defendants conspired to end-run the 48-hour rule by having a judge conduct a sham *Gerstein* hearing on the ammunitions charges to extend his interrogation.

192.     Eventually, DeYoung's will was completely overborn and he agreed to tell the false story that the police told him. He was exhausted, scared, suffering physical discomfort, and feared actual death. DeYoung told the detectives that he would repeat their story but had no first-hand knowledge and was "cooperating" simply to get out of police custody and to get medical care.

193.     Defendants Falk and Gilger brought DeYoung to the crime scene and dictated the story they wanted DeYoung to repeat to the Defendant Prosecutors and the grand jury. Defendants Falk and Gilger then brought DeYoung to the CCSAO to practice his false story with ASA Varga who showed him the video from the robbery/shooting. Defendant Varga was fully

aware that DeYoung's story was fabricated and a product of extreme coercion. Defendant Varga was aware that DeYoung was suffering the physical effects of having his insulin withheld; Varga had seen the patently unconstitutional and coercive interrogation of DeYoung on January 5 through January 7. DeYoung told Defendant Varga that the story he was telling was not true but that he was desperate to be released from police custody. Despite knowing that DeYoung was lying, Defendant Varga pressed forward with his plans to present DeYoung false testimony to the grand jury.

194.    Defendant Varga showed DeYoung the video footage from the robbery and told DeYoung the names of the individuals in the video because DeYoung did not know anything about the incident other than what police fed to him. DeYoung was still denied water and was in physical discomfort during his meeting with Defendant Varga. At no point was DeYoung outside the presence of the interrogating detectives, and Defendant Varga did not ask how he was treated in any event.

195.    When brought before the grand jury to testify, DeYoung recalls shaking his leg incessantly through his grand jury testimony, because he had to urinate so badly. He was terrified that he would urinate on himself before the grand jury. He repeated the story he had been fed.

196.    Immediately after his testimony before the grand jury, DeYoung was provided with an insulin shot at the hospital. He was eventually charged with the ammunitions offense for which he went to prison. Because of his incarceration and lack of medical care in IDOC, he had three toes amputated while incarcerated on the bogus ammunitions case.

197.    DeYoung's fabricated statement and grand jury testimony was repeatedly cited as the basis to deny Plaintiff bail on the charges. Indeed, after Plaintiff's confession was suppressed the *only* evidence that existed to justify Plaintiff's continued detention was DeYoung's coerced

and fabricated statement and grand jury testimony. Defendant Varga was directly involved in fabricating this evidence, knowing it to be fabricated, and presenting to the grand jury to ensure that Plaintiff remained detained.

198.    As recently as November 23, 2023, the CCSAO produced a disc of additional exculpatory material that Defendant Varga hid in a folder entitled "summaries of recorded prison calls." The disc, however, was labeled "PO LEWIS FBI DRAFT ANALYSIS" and was written in Defendant Varga's handwriting.

199.    The disc and much of its contents had *never* been disclosed to Plaintiff or his criminal co-defendants and offered irrefutable proof that the Prosecutor Defendants were in possession of the exculpatory 2012 exigent cell analysis conducted by Agent Wallschlaeger in January 2012.

200.    The disc also contained altered versions of the 2012 analysis and showed that Defendant Varga had, at some prior point to Plaintiff's release, altered the analysis to conceal the exculpatory nature of the information. Defendant Varga ensured that all of the original cell tower material was destroyed to prevent any independent expert from conducting an analysis.

201.    Defendant Varga concealed the 2012 exculpatory analysis and made plans to produce fraudulent versions of the analysis in the event defense counsel discovered the existence of the materials. Fortunately for Plaintiff, counsel for Villa uncovered the materials in 2022 which resulted in Defendant Varga being removed from the case. To conceal his egregious misconduct, he attempted to conceal the disc in a file contained in one of a dozen bankers boxers in hopes that it would never be found. The CCSAO discovered it an had the good sense to produce it, admitting that the handwriting on the disc belonged to Defendant Varga.

**P.** **Plaintiff's Charges Are Dismissed the Day After the Circuit Court Judge Rules that Defendants Varga and Adduci Would Have to Testify at a *Youngblood/Brady* Hearing Concerning the Destruction and Concealment of a Mountain of Exculpatory Evidence.**

202.    In 2022, a mountain of previously suppressed and destroyed exculpatory evidence was uncovered through investigative work of new counsel for Villa and Colon. Some, although not all, of that suppressed and destroyed exculpatory evidence is detailed in the foregoing paragraphs.

203.    The Honorable Judge Reddick ordered a hearing to explore Plaintiff and his criminal co-defendant's constitutional violations pursuant to *Trombetta, Youngblood, Brady* and the Illinois rules of discovery. The hearing was scheduled to commence on June 21, 2023.

204.    On June 20, 2023, Defendants Adduci and Varga through their counsel moved to quash the subpoena requiring them to appear and give testimony at the hearing. Judge Reddick denied the motion and ruled that the hearing would move forward the following day.

205.    The following day, prior to the commencement of the hearing, the CCSAO dismissed all charges against Plaintiff and his criminal co-defendant Colon.

206.    Plaintiff was released from Cook County Jail that same day. His many prior motions for bail had been denied. He was detained from January 5, 2012 until June 21, 2023. He was never brought to trial.

**Q.** **Chicago's Policy and Practice of Wrongly Convicting Innocent Persons in Violation of the Constitution**

207.     The City of Chicago and the Chicago Police Department are responsible, by virtue of their official policies, for inflicting miscarriages of justice on scores of criminal defendants like the one endured by the Plaintiff.

208.     Since the 1980s, no fewer than 150 cases have to come to light in which Chicago police officers fabricated false evidence and/or suppressed exculpatory evidence in order to cause the false arrest, malicious prosecutions, and wrongful convictions of innocent persons for serious crimes they did not commit.

209.     These cases include many in which Chicago police officers used the same tactics that Defendants employ against Plaintiff in this case, including but not limited to fabricating evidence, concealing exculpatory evidence, coercing statements through physical and psychological abuse, and manipulating and threatening witnesses in order to procure false testimony - all to secure the arrest, prosecutions, and conviction of a person without probable cause and without regard for the person's actual guilt or innocence.

210.     At all relevant times, members of the Chicago Police Department, including the Defendants in this action, routinely coerced and fabricated confessions from detainees that they knew were false.

211.     The municipal policy and practice described in a Federal Bureau of Investigation FD-302 Report of an interview with Assistant State's Attorney Terence Johnson. The Report documents, *inter alia,* that Chicago police detectives would feed information to witnesses and coach them through court-reported and handwritten statements, coerce witnesses into sticking to a detective's theory of the case, physically abuse witnesses, and work together to develop and rehearse narrative so there were no inconsistencies in witness's stories.

212.     At all relevant times, members of the Chicago Police Department, including the Defendants in this action, systematically suppressed exculpatory and/or impeaching material by intentionally secreting discoverable reports, memos, and other information. This concealed material was kept in files that were maintained only at the Chicago Police Department and never disclosed to the participants of the criminal justice system. As matter of widespread custom and practice, these clandestine files were withheld from criminal defendants and they were routinely destroyed or hidden at the close of the investigation rather than being preserved as part of the official file.

213.     At all relevant times, members of the Chicago Police Department, including the Defendants in this action, systematically suppressed exculpatory and/or impeaching material by purposefully avoiding documenting exculpatory evidence that did not support detectives' theory of the case. Indeed, Defendant Cirone's emails set forth in ¶176 of this Complaint expressly sets out the practice of the CPD as it relates to purposefully concealed exculpatory information by simply not recording it.

214.     At all relevant times, members of the Chicago Police Department, including the Defendants in this action, systematically suppressed exculpatory and/or impeaching material by creating draft reports on Microsoft word, printing those reports or emailing those reports to supervisors or other officers and even prosecutors for edits. Draft reports were a collective effort and resulted in curated reports that excluded exculpatory or impeaching information. Draft reports are routinely destroyed or remain on email servers. Only curated reports that contain a narrative wiped of all exculpatory material is eventually submitted into the CPD electronic filing system sometimes months even years after the initial draft is authored.

215.     At all relevant times, members of the Chicago Police Department, including the Defendants in this action, systematically suppressed exculpatory and/or impeaching material by initiating parallel investigations, often known as gang investigations, with unique filing numbers and case numbers that were conducted in secret and where exculpatory information was concealed, as occurred in the instant case.

216.     At all relevant times, the Chicago Police Department had a policy and practice of initiating gang investigations separate and apart from investigations related to the underlying crime. Such gang investigations are conducted in secret and designed to allow officers to take investigative acts in connection with a specific that could reveal exculpatory material but

217.     Consistent with the municipal policy and practice described in the preceding paragraph, employees of the City of Chicago, including the named Defendants, concealed exculpatory evidence from Plaintiff.

218.     The existence of this policy and practice of suppressing exculpatory and/or impeaching material in clandestine files was established and corroborated in the cases of, *inter alia*, *Rivera v. Guevara*, No. 12 C 4428 (N.D. Ill.), *Fields v. City of Chicago*, No. 10 C 1168 (N.D. Ill.), and *Jones v. City of Chicago*, No. 87 C 2536 (N.D. Ill.).

219.     The policies and practices of file suppression at issue in *Fields* applied throughout the timeframe from the 1980s through the 2000s. Although CPD has adjusted its suppression of exculpatory evidence in parallel files in accordance with technological advancements, the file suppression issue in *Fields* is fundamentally the same as the file suppression issue in this case.

220.     In addition, a set of clandestine files related to Area Five homicides—the same Detective Division involved in this case—was found in the case of *Rivera v. Guevara*, No. 12 C

4428 (N.D. Ill.). Those files, for a period in the 1980s and 1990s, contained exculpatory and impeaching evidence not turned over to criminal defendants.

221.    The policy and practice of suppressing exculpatory and/or impeaching material evidence was alive and well at all relevant times, including at the Area Five Detective Division during the investigation at issue here.

222.    Moreover, the City of Chicago and the Chicago Police Department routinely failed to investigate cases in which Chicago police detectives recommended charging an innocent person with a serious crime, and no Chicago police officer has ever been disciplined as a result of his misconduct in any of those cases.

223.    Prior to and during the period in which Plaintiff was falsely charged and convicted, the City of Chicago also operated a dysfunctional disciplinary system for Chicago police officers accused of serious misconduct. The City almost never imposed significant discipline against police officers accused of violating the civil and constitutional rights of members of the public. Further, the disciplinary apparatus had no mechanism for identifying police officers who were repeatedly accused of engaging in misconduct.

224.    In the case of *Klipfel v. Bentsen*, No. 94 C 6415 (N.D. Ill), a federal jury in Chicago returned a *Monell* verdict against the City, finding that the City was responsible for maintaining a code of silence and a deeply flawed disciplinary system that allowed Chicago police officers (operating out of the very same police facilities as the Defendant Officers in this case) to operate a far-reaching, long-running criminal enterprise that included the subversion of homicide investigations.

225.    The *Klipfel* plaintiffs were two former federal agents from the Bureau of Alcohol, Tobacco and Firearms who brought allegations of rampant criminal misconduct among Gang

Crimes officers to the attention of CPD officials. The evidence in that litigation included: Philip Cline, an Area Commander and future Chief of Detectives and Superintendent, personally filed two Internal Affairs complaints against Miedzianowski for tampering in homicide investigations, that resulted in no discipline whatsoever; and that Raymond Risley, an assistant deputy superintendent and head of Internal Affairs, not only knew about misconduct in homicide cases but actively participated in efforts to subvert the disciplinary investigation into Miedzianowski that was at the heart of the *Klipfel* litigation.

226. In *Obrycka v. City of Chicago,* No. 07 C 2372 (N.D. Ill), a different federal jury found that, as February 2007, "the City had a widespread custom and/or practice of failing to investigate and/or discipline its officers and/or code of silence."

227. As a matter of both policy and practice, municipal policy makers and department supervisors condoned and facilitated a code of silence within the Chicago Police Department, which has been acknowledged by leaders of the Chicago Police Department and elected officials in Chicago. In accordance with the code of silence, officers refused to report and otherwise lied about misconduct committed by their colleagues, including the misconduct at issue in this case.

228. As a result of the City of Chicago's established practices, officers (including the Defendants here) have come to believe that they may violate the civil rights of members of the public and cause innocent persons to be charged with serious crimes without fear of adverse circumstances. The practices that enable this belief include failing to track and identify police officers who are repeatedly accused of serious misconduct, failing to investigate cases in which the police are implicated in a wrongful charge or conviction, failing to discipline officers accused of serious misconduct, and facilitating a code of silence within the Chicago Police Department. As a result of these policies and practices of the City of Chicago, members of the Chicago Police

Department act with impunity when they violate the constitutional and civil rights of citizens.

229.    This belief extends to the Defendants in this case, including many of the Defendants in this case. They engaged in such misconduct because they had no reason to fear that the City of Chicago and its Police Department would ever discipline them for doing so.

230.    The Chicago Police Accountability Task Force reported in April 2016 that "[g]oing back years, and continuing to the present day, COD has missed opportunities to make accountability an organizational priority." Between 2004 and 2016, the City paid more than $500 million to settle or pay judgments in police misconduct cases. The City recommended disciplinary action in fewer that 4% of those cases and did not conduct any disciplinary investigations in over half of those cases.

231.    The City of Chicago and its Police Department also failed in the years prior to the Plaintiff's malicious prosecution to provide adequate training to Chicago police detectives and other officers in many areas, including the following:

    a.    The constitutional requirement to disclose exculpatory evidence, including how to identify such evidence and what steps to take when exculpatory evidence has been identified in order to ensure that the evidence is made part of the criminal proceeding.

    b.    The need to refrain from physical and psychological abuse, and manipulative and coercive conduct, in relation to suspects and witnesses.

    c.    The use of anonymous or confidential informants.

    d.    risks of wrongful conviction and the steps police officers should take to minimize risks.

    e.    The risks of engaging in tunnel vision during investigation.

     f.     The need for full disclosure, candor, and openness on the part of all officers who participate in the police disciplinary process, both as witnesses and as accused officers, and the need to report misconduct committed by fellow officers.

232.     The need for police officers to be trained in these areas was and remains obvious. The City's failure to train Chicago police officers as alleged in the preceding paragraph caused Plaintiff's wrongful conviction and his injuries.

233.     Consistent with the municipal policy and practice described in the preceding paragraph, employees of the City of Chicago, including the named Defendants, concealed exculpatory evidence from Plaintiff.

234.     The city's failure to train, supervise, and discipline its officers, including the Police Officer Defendants, condones, ratifies, and sanctions the kind of misconduct that the Defendants committed against Plaintiff in this case. Constitutional violations such as those that occurred in this case are encouraged and facilitated as a result of the City's practices and de facto policies, as alleged above.

235.     The City of Chicago and final policymaking officials within the Chicago Police Department failed to act to remedy the patterns of abuse described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct. They thereby perpetuated the unlawful practices and ensured that no action would be taken (independent of the judicial process) to remedy Plaintiff's ongoing injuries.

236.     The policies and practices described in the foregoing paragraphs were also approved by the City of Chicago policymakers, who were deliberately indifferent to the violations of constitutional rights described herein.

**Plaintiff's Damages**

237.     Plaintiff has suffered and continues to suffer enormous physical and psychological injury as a direct and proximate result of the Defendants' misconduct. Plaintiff served nearly 12 years in Cook County Jail for crimes that he did not commit. Although he was presumed innocent, and was in fact innocent, he endured the cruelest conditions of confinement over the course of 12 years.

238.     Plaintiff was arrested in his 20s and was released from the Cook County Jail in his 40s. Plaintiff was separated from his family and woke up every wondering when his nightmare would end. His confinement was particularly difficult where he was harassed, mistreated, and arbitrary punished by Cook County jail personnel because he was an accused "cop killer."

239.     As a result of Defendants' actions, Plaintiff continues to experience physical and psychological pain and suffering, humiliation, constant fear and anxiety, deep depression, despair, rage, and other physical and psychological effects from his years of wrongful conviction.

## <u>COUNT I</u>
## 42 U.S.C. § 1983 – Malicious Prosecution and Prolonged Detention

240.     Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

241.     In manner more fully described above, the Defendant officers and the Defendant Prosecutors, acting individually, jointly, and in conspiracy, as well under color of law and within the scope of their employment, deprived Plaintiff of his Fourth and Fourteenth Amendment constitutional rights.

242.     The Defendant officers and Defendant Prosecutors accused Plaintiff of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so, in violation of his rights secured by the Fourth

Amendment and the procedural and substantive due process components of the Fourteenth Amendment.

243.     The Defendants subjected Plaintiff to unauthorized and arbitrary governmental action that shocks the conscience in that Plaintiff was deliberately and intentionally framed for a crime of which he was totally innocent, through the Defendants' fabrication of evidence, and suppression, and withholding of evidence.

244.     The misconduct described above was objectively unreasonable and was undertaken intentionally, with malice, willful indifference to Plaintiff's constitutional rights and in total disregard of the truth and Plaintiff's clear innocence.

245.     As a direct and proximate result of this deprivation of his constitutional right, Plaintiff suffered injuries, including but limited to loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

246.     The misconduct described above in this Count by the Defendant officers was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VII.

<u>**COUNT II**</u>
**Coerced and False Confession - Fifth and Fourteenth Amendments**

247.     Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

248.     In a manner described more fully above, the Police Officer Defendants, , and Defendant Brassil, acting in an investigatory capacity, and without probable cause to suspect Plaintiff of the crime, individually, jointly, and in conspiracy with one another, and other unknown, as well as under color of law and within the scope of their employment, forced

Plaintiff to make a false statement involuntarily against his will, which incriminated him and which were used against him in criminal proceedings, including grand jury proceedings, in violation of his constitutional rights under the Fifth and Fourteenth Amendments.

249.    In addition, the Police Officer Defendants and Defendant Brassil, acting as an investigator and without probable cause to suspect Plaintiff of any crime, individually and jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, used violence and psychological coercion in order to force Plaintiff to incriminate himself falsely and against his will in a crime he had not committed, in violation of his right to due process secured by the Fourteenth Amendment. This misconduct was so severe as to shock the conscience, it was designed to injure Plaintiff, and it was not supported by any conceivable governmental interest.

250.    Specifically, Police Officer Defendants and Defendant Brassil conducted, participated in, encouraged, advised, and ordered an unconstitutional interrogation of Plaintiff, using violence and psychological coercion and false promises which overbore Plaintiff's will and resulted in him making involuntary statements implicating himself in the shooting. The Police Officers Defendants and Defendant Brassil also knew that Plaintiff was of limited intellectual abilities, having an IQ of 66 when they used a variety of coercive tactics ranging from prolonged detention, threats, promises of both leniency and promises of harsher treatment, instilling feelings of hopelessness by refusing to honor Plaintiff's repeated invocations of both his invocations of his right to remain silent and right to counsel.

251.    Those false incriminating statements were wholly fabricated by the Defendants and attributed to Plaintiff who was forced to regurgitate the statements. Those false incriminating statements were used against Plaintiff to his detriment throughout before grand jury proceedings.

The statements were used as evidence to deny Plaintiff bail throughout his 12-year detention. The statements were used to support Plaintiff's continued and prolonged detention pretrial.

252.     The misconduct described in this Court was objectively unreasonable and was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

253.     As a result of Defendants' misconduct described in this County, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

254.     The misconduct described in this County by the Police Officer Defendants was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VII.

### COUNT III
### 42 U.S.C. § 1983 – Due Process:  Fabrication of Evidence

255.     Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

256.     As more fully described above, the individual Police Officer Defendants and the Prosecutor Defendants, acting individually, jointly, and in conspiracy, as well under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to fair criminal proceedings, including at his grand jury proceedings, in violation of the Fourteenth Amendment, by fabricating Plaintiff's coerced confession, Colon's coerced confession, and DeYoung's coerced statements.

257.     In the manner described more fully above, Defendant Noradin's grand jury testimony which was based entirely on the coerced and fabricated confessions of Colon and Plaintiff and the coerced statements of Melvin DeYoung. Defendants also coerced and fabricated statements of Melvin DeYoung that were taken under conditions that was nothing short of

torture. Defendants knew that DeYoung's statements were fed to him and entirely fabricated. Those fabricated statements were relied on to justify Plaintiff's continued detention in the Cook County Jail and as grounds to deny his many motions for bond pending trial.

258. A defendant violates due process when he uses false evidence to deprive a criminal defendant of his liberty in some way. The Police Officer Defendants and Prosecutor Defendants concealed and fabricated additional evidence that is not yet known to Plaintiff.

259. Absent this misconduct, Plaintiff would not have been wrongfully charged, denied bond, and detained for 12 years prior to the dismissal of all charges against him. Thus, the Defendants' misconduct deprived Plaintiff of his constitutional right to fair trial proceedings, notwithstanding that a trial never occurred. This misconduct resulted in Plaintiff's 12 year wrongful detention.

260. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

261. As a direct and proximate result of this deprivation of his constitutional right to a fair trial, Plaintiff suffered injuries, including but limited to loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

262. The misconduct described above in this Count by the Defendant officers was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VIII.

### COUNT IV
### 42 U.S.C. § 1983 – Due Process: *Brady* Violations

263.    Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

264.    As described in detail above, all of the individual Police Officer Defendants and the Prosecutor Defendants, acting individually, jointly, and in conspiracy, as well under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to fair trial proceedings, in violation of the Fifth and Fourteenth Amendments by withholding and suppressing exculpatory evidence from Plaintiff.

265.    All of the Defendant Officers and Prosecutor Defendants concealed exculpatory evidence that would have prevented Plaintiff's indictment, resulted in his release on bond, and resulted in earlier dismissal of his charges.

266.    The Defendants hid or destroyed, *inter alia,* exonerating cell tower analysis, cell phone records, POD video, PS3 data, evidence of third party perpetrators, evidence concerning the coercive nature of the interrogations of Plaintiff, Colon, Villa, and DeYoung, and untold numbers of police reports that memorialized exculpatory material. Indeed, Defendants conducted a secretive parallel investigation where they hid exculpatory material in files that were never produced to the criminal defendants.

267.    The Defendants further suppressed their own misconduct and the misconduct of their fellow officers and prosecutors.

268.    The Police Officer Defendants continued to suppress exculpatory evidence after Plaintiff's conviction. Had this exculpatory evidence been disclosed, Plaintiff would not have spent 12 years in the Cook County Jail for a crime he did not commit.

269.     The misconduct described above was objectively unreasonable and was undertaken intentionally, with malice, willful indifference to Plaintiff's constitutional rights and in total disregard of the truth and Plaintiff's clear innocence.

270.     As a direct and proximate result of this deprivation of his constitutional right to a fair trial, Plaintiff suffered injuries, including but limited to loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

271.     The misconduct described above in this Count by the Defendant officers was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VII.

## COUNT V
### 42 U.S.C. § 1983 – Conspiracy to Violate Constitutional Rights

272.     Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

273.     All of the individual Police Officer Defendants and Defendant Prosecutors, and other co-conspirators, known and not yet known to Plaintiff, reached an agreement amongst themselves to coerce, induce, and fabricate false evidence in the form of coerced and false confessions for the purpose of framing Plaintiff for a crime he did not commit.

274.     All of the individual Defendants, and other co-conspirators, known and not yet known to Plaintiff, reached an agreement amongst themselves to deprive Plaintiff of material exculpatory evidence and information to which he was lawfully entitled and to conceal their misconduct from Plaintiff, all in violation of Plaintiff's constitutional rights, as described above.

275.     In this manner, the Defendants acting in concert with other known and unknown co-conspirators, conspired to accomplish an unlawful purpose by an unlawful means.

276.    In furtherance of the conspiracy, each of the co-conspirators committed overt acts and was an otherwise willful participant joint activity.

277.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally and with willful indifference to Plaintiff's constitutional rights.

278.    As a direct and proximate result of this of this illicit agreement referenced above, Plaintiff suffered injuries, including but limited to loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

279.    The misconduct described above in this Count by the Defendant officers was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VII.

<u>**COUNT VI**</u>
**42 U.S.C. § 1983 – Failure to Intervene**

280.    Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

281.    In the manner described above, one or more of the individual Police Officer Defendants and Defendants Prosecutors, and other unknown individuals, stood by without intervening to prevent the alleged constitutional violations, despite having an opportunity to do so.

282.    These Defendants had ample, reasonable opportunities as well as a duty to prevent this harm but failed to do so.

283.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with willful indifference to Plaintiff's constitutional rights, and in total disregard of the truth and Plaintiff's innocence.

284.    As a direct and proximate result of this failure to intervene to prevent the violation of Plaintiff's constitutional rights, Plaintiff suffered injuries, including, but not limited to, loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

285.    The misconduct described above in this Count by the Defendant officers was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VII.

<u>COUNT VII</u>
**42 U.S.C. § 1983 – *Monell* Policy and Practice Claim**

286.    Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

287.    The Chicago Police Department is responsible for scores of miscarriages of justice. Since 1985, no fewer than 75 documented cases have come to light in which Chicago Police Detectives amassed "evidence" against an innocent person for a serious crime that he did not commit. There are undoubtedly many more such cases that have not yet been discovered.

288.    The false charges against innocent people include numerous cases in which Chicago Police Officers used the very same tactics that Defendants employed against Plaintiff in this case, including: (1) concealment of exculpatory evidence; (2) manipulation of witnesses in order to obtain false identifications; and (3) manipulation of witnesses in order to influence their testimony; (4) the use of coercion to obtain false confessions; and (5) the use of other tactics to secure the arrest, prosecution and conviction of a person without regard to his actual guilt or innocence of the offense.

289.    At all times relevant hereto, members of the Chicago Police Department, including but not limited to the Defendants in this action, systematically suppressed exculpatory

and/or impeaching material by intentionally secreting discoverable reports, memos and other information in files that were maintained solely at the police department and were not disclosed to the participants of the criminal justice system. As a matter of widespread custom and practice, these clandestine files were withheld from the State's Attorney's Office and from criminal defendants, and they were routinely destroyed at the close of the investigation, rather than being maintained as part of the official file.

290. Consistent with the municipal policy and practice described in the preceding paragraph, employees of the City of Chicago, including but not limited to the named Defendants, concealed exculpatory evidence from Plaintiff, including evidence that Defendants coerced, manipulated, and procured false confessions from Plaintiff, Colon and uncharged co-conspirator DeYoung.

291. The City of Chicago and the Chicago Police Department has failed to investigate any of the cases in which Chicago Police Detectives recommended charging an innocent person with a serious crime, and no Chicago Police Officer has ever been disciplined as a result of his misconduct in any of those cases.

292. Prior to and during 2012, the year in which Plaintiff was falsely charged with the murder of Clifton Lewis, the City of Chicago operated a dysfunctional disciplinary system for Chicago Police Officers accused of serious misconduct. The Former Chicago Police Officer of Professional Standards almost never imposed significant discipline against police officers accused of violating the civil and constitutional rights of members of the public. The Chicago Police disciplinary apparatus included no real mechanism for identifying police officers who were repeatedly accused of engaging in the same type of misconduct.

293. As a matter of both policy and practice, municipal policy makers and department supervisors condoned and facilitated a code of silence with the Chicago Police Department. In accordance with this code, officers refused to report and otherwise lied about misconduct committed by their colleagues, including the misconduct at issue in this case.

294. As a result of the City of Chicago's established practice of not tracking and identifying police officers who are repeatedly accused of the same kinds of serious misconduct, failing to investigate cases in which the police are implicated in a wrongful charge or conviction, failing to discipline officers accused of serious misconduct and facilitating a code of silence within the Chicago Police Department, officers (including the Defendants here) have come to believe that they may violate the civil rights of members of the public and cause innocent persons to be charged with serious crimes without fear of adverse consequences. As a result of these policies and practices of the City of Chicago, members of the Chicago Police Department act with impunity when they violate the constitutional and civil rights of citizens

295. The defendant officers have a long history of engaging in the kind of investigative misconduct that occurred in this case, including manipulation/coercion of suspects and witnesses, fabrication of evidence, and concealment of evidence in the course of maliciously prosecuting innocent persons. Defendants engaged in such misconduct because they had no reason to fear that the City of Chicago and its Police Department would ever discipline them for doing so.

296. The City of Chicago and its Police Department failed in 2012 and in the years prior to provide adequate training to Chicago Police Detectives and other officers in any of the following areas, among others:

a. The constitutional requirement to disclose exculpatory evidence, including how to identify such evidence and what steps to take when exculpatory evidence has been identified in order to ensure that the evidence is made part of the criminal proceeding.

b. The need to refrain from manipulation or potentially coercive conduct in relation to suspects and witnesses.

c. The need to refrain from using physical violence, threats of violence, and psychological coercion to procure involuntary statements from suspects.

d. The risks of wrongful conviction and the steps police officers should take to minimize risks.

e. The risks of engaging in tunnel vision during investigation.

f. The need for full disclosure, candor, and openness on the part of all officers who participate in the police disciplinary process, both as witnesses and as accused officers, and the need to report misconduct committed by fellow officers.

297. The need for police officers to be trained in these areas was and remains obvious. The City of Chicago's failure to train Chicago Police Officers as alleged in the preceding paragraph proximately caused Plaintiff's wrongful conviction and his injuries.

298. The City's failure to train, supervise, and discipline its officers, including repeat offenders such as many of the Defendants named in this case effectively condones, ratifies, and sanctions the kind of misconduct that the Police Officer Defendants committed against Plaintiff in this case. Constitutional violations such as occurred in this case are encouraged and facilitated as a result of the City's practices and *de facto* polices, as alleged above.

299.     The City of Chicago and officials within the Chicago Police Department failed to act to remedy the patterns of abuse described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct. They thereby perpetuated the unlawful practices and ensured that no action would be taken (independent of the judicial process) to remedy Plaintiff's ongoing injuries.

300.     The policies and practices described in the foregoing paragraphs were consciously approved by the City of Chicago policymakers who were deliberately indifferent to the violations of constitutional rights described herein.

301.     The actions of all of the individual Police Officer Defendants were done pursuant to policies and practices of the Chicago Police Department were done pursuant to one or more interrelated *de facto* policies, practices and/or customs of the Defendant City of Chicago which were ratified by policymakers for the City of Chicago with final policymaking authority. These policies and practices included, among others:

    a.    manufacturing and fabricating false witness statements and manipulating and lying to witnesses to influence unreliable and inaccurate testimony, as well, as manufacturing and coercing false statements from suspects.

    b.    filing false reports and giving false statements and testimony about interrogations and witness interviews or constructing parts or all of witness statements; suppressing evidence concerning interrogations and/or witness interviews; pursuing and obtaining wrongful prosecutions and false imprisonments on the basis of fabricated witness statements, including those by "jailhouse snitches;" and otherwise covering up the true nature of those interviews and/or interrogations.

c.    failing to properly train, supervise, discipline, transfer, monitor, counsel and/or otherwise control police officers, particularly those who are repeatedly accused of misconduct, on how to avoid false arrests, wrongful imprisonments, malicious prosecutions, and wrongful convictions, and on the proper manner in which to conduct interrogations of witnesses and arrestees. Among those the City failed to properly train, supervise, discipline, transfer, monitor, counsel and/or otherwise control were the repeat offenders Defendants Guevara and Halvorsen.

d.    perpetuating, encouraging and condoning the police code of silence, specifically in cases where officers engaged in the violations articulated in paragraphs a-d above, whereby police officers refused to report or otherwise covered-up instances of police misconduct, and/or fabricated, suppressed and destroyed evidence of which they were aware, despite their obligation under the law and police regulations to report. This code of silence caused police officers either to remain silent or give false and misleading information during official investigations and Grand Jury proceedings in order to protect themselves or fellow officers from discipline, civil liability, or criminal charges. The code of silence also caused police officers to perjure themselves in criminal cases where they and their fellow officers have fabricated evidence or concealed exculpatory evidence.

302.    The policies and practices described in this Count and in the factual allegations section of this Complaint were maintained and implemented by the City of Chicago with deliberate indifference to Plaintiff's constitutional rights.

303.    As a direct and proximate result of the City's actions, Plaintiff suffered injuries, including, but not limited to, emotion distress, as if more fully alleged above.

304.    The City of Chicago is therefore liable for the misconduct committed by the Police Officer Defendants.

Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

305.    In a manner described more fully above, the Police Officer Defendants, individually, jointly, and in conspiracy with one another, and other unknown actors, as well as under color of law and within the scope of their employment, arrested and seized Plaintiff without probable cause to believe he committed an offense on January 5, 2012.

306.    In a manner described more fully above, the facts and circumstances known to the Defendant Officers at the time of Plaintiff's arrest would not have led a reasonable officer to believe that Plaintiff was involved in the robbery and homicide of Lewis. Defendants *knew* that they Colon had not implicated Plaintiff in any crime and to the extent Colon made any statements incriminating Plaintiff prior to Plaintiff's arrest, Defendants knew that they fabricated those statements.

## COUNT VIII
### State Law Claim – Malicious Prosecution

307.    Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

308.    All of the individual Defendants caused Plaintiff to be improperly subjected to judicial proceedings for which there was no probable cause. These judicial proceedings were

instituted and continued with malice and resulted in the injury to Plaintiff. All such proceedings were ultimately terminated in Plaintiff's favor and in a manner indicative of innocence.

309.     The Defendants accused Plaintiff of murdering Clifton Lewis, knowing that he was innocent of the crime. All of the individual defendants fabricated evidence, manipulated witness testimony, and withheld exculpatory evidence. The individual Defendant officers knowingly made false statements to the grand jury with the intent of exerting influence to institute and continue judicial proceedings against Plaintiff.

310.     The misconduct described in this Count was undertaken with malice, willfulness and reckless indifference to Plaintiff's rights.

311.     As a direct and proximate result of this misconduct, Plaintiff suffered injuries, including, but not limited to, emotional distress, as is more fully alleged above.

<u>**COUNT IX**</u>
**State Law Claim – Civil Conspiracy**

312.     Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

313.     As described more fully in the preceding paragraphs, the individual Defendant officers acting in concert with one another and other co-conspirators, known and unknown, conspired to accomplish an unlawful purpose by unlawful means. In additional, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of these rights.

314.     In furtherance of the conspiracy, the Defendants committed overt acts and were otherwise willing participants in joint activity.

315.    The violations of Illinois law described in this complaint, including Defendants' malicious prosecution of Plaintiff and their intentional infliction of emotion distress, were accomplished by Defendants' conspiracy.

316.    The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

317.    As a direct and proximate result of this misconduct, Plaintiff suffered injuries, including, but not limited to, emotional distress, as is more fully alleged above.

**COUNT X**
**State Law Claim – Intentional Infliction of Emotional Distress**

318.    Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

319.    The acts and conduct of the individual Defendants as set forth above were extreme and outrageous. The Defendants intended to cause or were in reckless disregard of the probability that their conduct would cause sever, emotional distress to Plaintiff.

320.    The individual Defendants' actions and conduct directly and proximately caused severe emotional distress to Plaintiff, and thereby constituted intentional infliction of emotional distress.

321.    The misconduct described in this Count was undertaken with malice, willfulness and reckless indifference to Plaintiff's rights.

322.    As a direct and proximate result of Defendants' wrongful acts, Plaintiff suffered injuries, including, but not limited to, emotional distress, as is more fully alleged above.

**COUNT XI**
**State Law Claim - Willful and Wanton Conduct**

323.    Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

324.    At all times relevant to this complaint the Defendants had a duty to refrain from willful and wanton conduct.

325.    Notwithstanding that duty, these Defendants acted willfully and wantonly through a course of conduct that showed an utter indifference to, or conscious disregard of, Plaintiff's rights.

326.    As a direct and proximate result of Defendants' wrongful acts, Plaintiff suffered injuries, including, but not limited to, emotional distress, as is more fully alleged above.

**COUNT XII**
**State Law Claim – *Respondeat Superior***

327.    Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

328.    When they committed the acts alleged in this Complaint, the individual Defendant officers were members and agents of the Chicago Police Department, an agency of the City of Chicago, acting at all relevant times within the scope of their employment and under color of law.

329.    Defendant City of Chicago is liable as principal for all torts committed by its agents.

**COUNT XIII**
**State Law Claim – Indemnification**

330.    Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

331.     Illinois law provides that public entities must pay any tort judgment for compensatory damages for which its employees are liable based on upon the employees' misconduct committed within the scope of their employment activities.

332.     The individual Defendant officers are or were employees of the Chicago Police Department, an agency of the City of Chicago, who acted within the scope of their employment in committing the misconduct described herein.

333.     Cook County must indemnify Defendants Dillon, Brassil, Varga and Adduci for all judgments entered against them.

**WHEREFORE**, Plaintiff Tyrone Clay prays this Court enter judgment in his favor and against Defendants NORADIN, CIRONE, BROGAN, WALSH, KELLER, ADAMS, SPANOS, GREEN, BARTIK, GRAHAM, PEREZ, FALK, GILGER, HILLMAN, MCDERMOTT, LEAVITT, FOLINO, BROGAN, INZERRA, BALODIMAS, ALVAREZ, YAMASHIROYA, MCCARTHY  DILLON, BRASSIL, VARGA, ADDUCI, and JOHN AND JANE DOE POLICE OFFICERS, the CITY OF CHICAGO, and COOK COUNTY, ILLINOIS awarding compensatory damages, costs and attorneys' fees against all Defendants, and punitive damages against each of the individual Defendants in their individual capacities; and for such further and additional relief as this Court may deem appropriate and just.

**JURY DEMAND**

Plaintiff demands trial by jury.

Respectfully Submitted,

**TYRONE CLAY**

By:     /s/JENNIFER BONJEAN

*One of His Attorneys*

Jennifer Bonjean
Ashley Cohen
Gabriella Orozco
Bonjean Law Group, PLLC
303 Van Brunt Street, 1st Fl.
Brooklyn, NY 11231
718-875-1850

**<u>Chicago Address</u>**
53 W. Jackson Blvd., Ste. 315
Chicago, Illinois 60604